UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| BRADLEY FULFER,<br><br>        Plaintiff,<br><br>    v.<br><br>WINCO HOLDINGS, INC.,<br><br>        Defendant. | No. 1:15-cv-00999-TLN-EPG<br><br><br>**ORDER ON SUMMARY JUDGMENT** |

This matter is before the Court on the motion for summary judgment filed by Defendant WinCo Holdings, Inc. (hereafter, "Defendant"). (ECF No. 30.) Plaintiff Bradley Fulfer (hereafter, "Plaintiff") filed an opposition. (ECF No. 43.) Plaintiff included with his reply papers numerous objections to the evidence cited in Defendant's summary judgment motion. (*See, e.g.*, ECF No. 43-7; ECF No. 43-8.) Defendant filed a reply to Plaintiff's opposition. (ECF No. 46.) Along with that reply, Defendant filed its own evidentiary objections to Plaintiff's declaration (ECF No. 46-3), as well as responses to Plaintiff's evidentiary objections raised regarding Defendant's evidence (*see, e.g.*, ECF No. 46-5; ECF No. 46-6).

The Court has carefully considered this case and reviewed all the materials provided by the parties. For the reasons set forth below, the Court GRANTS in part and DENIES in part Defendant's motion for summary judgment (ECF No. 30).

///

1

# I.    FACTUAL AND PROCEDURAL BACKGROUND

## A.    Factual Background

Unless otherwise indicated, the following facts are either explicitly or effectively undisputed by the parties.

### i.    General Background and Employment Agreements

Defendant is an employee-owned supermarket with various locations, including one in Modesto, California.  (ECF No. 30-3 ¶ 3.)  Plaintiff began working at Defendant's Modesto location as a part-time freight stocker in 2011.  (ECF No. 46-1 ¶ 3.)  At all relevant times, Defendant's attendance policy applied to Plaintiff's employment.  (ECF No. 46-1 ¶¶ 49–50.)  That policy stated that Defendant's employees could be disciplined, up to and including termination, in accordance with a system of progressive discipline.  (ECF No. 46-1 ¶ 51.)  The exact nature of the progressive discipline that could be imposed in any given employee's situation was set forth in an agreement between Defendant and the bargaining unit known as WinCo Foods #21 Hourly Employee Association, which was titled "Hourly Employee Working Conditions & Wage Agreement."  (ECF No. 30-3 at 11.)  At all relevant times, Plaintiff was subject to this agreement and Defendant's attendance policy.  (ECF No. 46-1 ¶¶ 5–6.)

The agreement that governed Plaintiff's employment with Defendant contained a number of provisions relevant to the instant suit.  The agreement generally provided that employees who worked shifts of more than five hours would be provided a thirty-minute meal period (i.e., a lunch break).  (ECF No. 30-3 at 15.)  The agreement more specifically provided that: (i) if an employee's shift was between six and seven hours long, this lunch break had to be taken between the second and fifth hours of work; and (ii) if an employee's shift was more than seven hours long, this lunch break had to be taken between the third and fifth hours of work.  (ECF No. 30-3 at 15.)  Defendant's policy was "not to allow employees to skip their lunch period."  (ECF No. 30-3 at 15.)

Defendant also maintained a Reasonable Workplace Accommodations Policy.  (*See* ECF No. 32 at 105–09.)  In a section labeled, "Process to Request a Reasonable Workplace Accommodation," this policy stated that an employee requesting an accommodation could do so

"through various means, including in person, in writing, or by providing a physician's note that denotes that the employee has a need for accommodation." (ECF No. 32 at 107.) Under the "Employee Responsibilities" section of this policy, "employees seeking a reasonable workplace accommodation are expected to provide necessary and appropriate medical documentation, when applicable." (ECF No. 32 at 106.)

### ii. Progressive Discipline System

Under the progressive discipline system that governed Plaintiff's employment with Defendant, any employee who accumulated nine or more attendance points in a rolling three-month period, or who accumulated fifteen or more points in a rolling twelve-month period, was subject to discipline. (ECF No. 46-1 ¶ 51; ECF No. 30-3 at 9.) Each absence resulted in three points. (ECF No. 46-1 ¶ 52; ECF No. 30-3 at 9.) An absence was defined as, "loss of time from work that is approved by management and NOT caused by: vacation, holiday, jury duty or subpoena to court, funeral leave, military leave, industrial injury, State or Federal Family Medical Leaves or an authorized leave of absence beyond seven (7) days." (ECF No. 46-1 ¶ 52.) Each incomplete shift or tardy arrival resulted in two disciplinary points. (ECF No. 46-1 ¶ 53; ECF No. 30-3 at 9.) An incomplete shift was defined as the failure to complete a shift for which the employee was scheduled, while a tardy was defined as punching in three or more minutes after the scheduled shift starting time or return from a lunch break. (ECF No. 30-3 at 9.)

Pursuant to the collective bargaining agreement, a first instance of "inadequate performance or improper activity will be discussed with the individual verbally by the store manager, assistant manager, and/or department manager," with a memorandum of said discussion being placed in the affected employee's file. (ECF No. 30-3 at 11.) "A second instance of the same or any other type will result in written warning which the employee will be asked to acknowledge." (ECF No. 30-3 at 11.) "A third instance of any violation of company policies or any type of inadequate performance can result in termination." (ECF No. 30-3 at 11.)

///

///

///

                  *iii.*       *Plaintiff's Interactions with Defendant's Progressive Discipline*

                              *System in 2014*

On April 2, 2014, Plaintiff received a verbal warning for accumulating twenty-two attendance-related points over a twelve-month period. (ECF No. 46-1 ¶ 55.) The parties dispute whether this verbal warning was consistent with Defendant's attendance policy, with Plaintiff arguing that he "unjustifiably received" six of these twenty-two points based on his nonappearance for work between September 27 and November 15, 2013. (ECF No. 46-1 ¶ 55.) Plaintiff asserts that he should not have been assessed disciplinary points for these two instances because he was unable to work on those dates due to stress and panic attacks "as a result of his medical condition." (ECF No. 46-1 ¶ 55.)

Plaintiff received another warning — this time memorialized in writing because he had already received a prior verbal warning — on June 19, 2014, for accumulating fifteen attendance-related points over a separate twelve-month period. (ECF No. 46-1 ¶ 56.) The parties dispute whether this written warning was consistent with Defendant's attendance policy, with Plaintiff arguing that he "unjustifiably received" five of these fifteen disciplinary points based on his nonappearance for work on April 11 and June 3, 2014. (ECF No. 46-1 ¶ 56.) Plaintiff asserts that he should not have been assessed disciplinary points for these two instances because he was ill on April 11, and he had a staph infection in his nose on June 3. (ECF No. 46-1 ¶ 56.)

On July 3, 2014, Plaintiff was absent from work and accumulated three attendance-related points as a result, apparently because he was suffering from the stomach flu. (ECF No. 46-1 ¶¶ 57, 58.) Defendant then suspended Plaintiff from July 7, 2014 through July 9, 2014, on the basis that he accumulated seventeen attendance-related points in a twelve-month period. (ECF No. 46-1 ¶ 58.) The parties dispute whether this suspension was consistent with Defendant's attendance policy, with Plaintiff arguing that he "unjustifiably received 3 points on July 2, 2014 because he was unable to come into work as a result of the stomach flu." (ECF No. 46-1 ¶¶ 57, 58.)

///

///

*iv.        Plaintiff's Work, Medical, and Leave History in 2015*

Plaintiff injured his knee in January of 2015, and sought treatment for that injury from Dr. Tushar Modi.  (ECF No. 46-1 ¶ 59.)  On January 22, Dr. Modi wrote a note to Defendant stating that Plaintiff "should be able to do modified duties" at work between January 22 and January 29.  (ECF No. 46-1 ¶ 60; ECF No. 46-2 ¶ 22.)  Also on January 22, Plaintiff filled out a form titled and characterized as Defendant's Reasonable Workplace Accommodation Request Form.  (ECF No. 46-2 ¶ 26; ECF No. 43-4 at 42.)  On this form, Plaintiff indicated that it was difficult for him to walk or kneel, and that he was requesting modified work duties to allow him to avoid having to walk or kneel.  (ECF No. 46-2 ¶ 26; ECF No. 43-4 at 42.)  Defendant received both the January 22 note and the Reasonable Workplace Accommodation Request Form shortly after they were created.  (ECF No. 46-2 ¶¶ 23, 27.)

Defendant did not place Plaintiff on any modified duties in January 2015.  (ECF No. 46-2 ¶ 31.)  The parties dispute why this decision — or lack thereof — was made.  Plaintiff asserts that Defendant — through an employee named Jennifer Amaral to whom Plaintiff explained the extent of the modified duties he was seeking — did not accommodate his request for modified duty because his injury did not occur on the job.  (*See* ECF No. 46-1 ¶ 16; ECF No. 43-6 at 49–50.)  Defendant, on the other hand, suggests that it was not required to accommodate Plaintiff's request for "modified duties" because Plaintiff failed to obtain clarification from Dr. Modi about what was meant by that term.  (ECF No. 46-1 ¶ 61.)  In any event, Defendant returned to Dr. Modi on January 23, at which point Dr. Modi excused Plaintiff from work entirely through January 29.  (ECF No. 46-1 ¶¶ 62–64.)

On January 29, Plaintiff worked a shift that began at 11:30 p.m. on that day and concluded at 6:49 a.m. on January 30.  (ECF No. 46-1 ¶¶ 64–65.)  During Plaintiff's next scheduled shift that began at 11:30 p.m. on January 30, however, he left work early due to swelling and pain in his injured knee.  (ECF No. 46-2 ¶ 37; ECF No. 43-3 at 3.)  The parties dispute whether Plaintiff left this scheduled shift early in order to receive additional medical treatment for his knee, or whether he simply left work early due to the pain he was purportedly experiencing.  (ECF No. 46-2 ¶ 37.)  Regardless of why he left this January 30 shift early, Defendant assessed Plaintiff two

attendance-related points as a result.  (ECF No. 46-2 ¶ 37; ECF No. 43-6 at 150.)  On February 2, Dr. Modi excused Plaintiff from work through February 16, and subsequently excused Plaintiff from work through February 23.  (ECF No. 46-1 ¶¶ 66–67.)

Then, on and following February 23, Dr. Modi filled out a series of employment-related forms that appear somewhat contradictory.  One form, a "Short Term Disability Claim Form" dated February 23, stated that Plaintiff's current restrictions as of that date included no bending or flexing of his knee.  (ECF No. 46-2 ¶ 45; ECF No. 32 at 259.)  Another form, a "Fitness for Duty Certification" form also dated February 23, stated that Plaintiff could return to work the next day with no physical restrictions.  (ECF No. 46-1 ¶ 70; ECF No. 32 at 265.)  Then on February 27, Dr. Modi filled out a "California Certification of Health Care Provider for Employee's or Family Member's Serious Health Condition" form, which stated that the probable duration of Plaintiff's medical condition or need for treatment would be three months.  (ECF No. 46-2 ¶ 47; ECF No. 43-4 at 127–28; ECF No. 32 at 263.)  This form also stated that Plaintiff was essentially unable to "perform work of any kind" and was "unable to perform any one or more of the essential functions of" his position.  (ECF No. 43-4 at 127; ECF No. 32 at 263.)  Dr. Modi faxed these completed forms to Defendant's third-party leave administrator, Unum, on February 27.  (ECF No. 46-1 ¶ 71; ECF No. 32 at 237–38.)  Plaintiff explains the discrepancies between these forms by asserting that though Dr. Modi's February 23 note released Plaintiff back to work with no restrictions, "Plaintiff obtained this [no-restrictions note] from his doctor since Defendant was not allowing Plaintiff to return to work on modified duties."  (ECF No. 46-1 ¶ 73.)

Plaintiff returned to work following this knee-related medical leave on the last day of February to work an overnight shift that was scheduled to conclude on March 1, 2015.  (ECF No. 46-2 ¶ 48; ECF No. 43-4 at 107.)  Defendant characterizes Plaintiff's return to work as being without any restrictions.  (ECF No. 46-1 ¶ 74.)  Plaintiff, on the other hand, asserts that he wore a knee brace, experienced significant pain in his knee, and informed his supervisors of this upon his return to work on March 1.  (ECF No. 46-1 ¶ 73.)  Plaintiff further states that during this March 1 shift, he requested "an accommodation of being placed in a cashier position" (ECF No. 46-1 ¶ 73), and informed his supervisors that he intended to apply for Family and Medical Leave Act

(hereafter, "FMLA") coverage for his knee injury (ECF No. 46-2 ¶ 49).  It does not appear that Plaintiff ever submitted a formal application for any open cashier position (ECF No. 46-2 ¶ 48; *see also* ECF No. 32 at 85–86), nor does it appear that Plaintiff ever formally applied for FMLA coverage for his knee injury (*see* ECF No. 46-2 ¶¶ 49–50).  Nor did Plaintiff return to Dr. Modi at any subsequent point for the purpose of receiving further treatment related to his knee.  (ECF No. 46-2 ¶¶ 48–49; ECF No. 32 at 226.)  Plaintiff did not become a cashier at Defendant's Modesto store prior to his termination.  (*See* ECF No. 46-1 ¶¶ 82–83 (stating that Plaintiff was terminated on the same day he was still performing the duties of a freight clerk).)

The parties dispute the subsequent course of events, which occurred at the time that Plaintiff was scheduled to work a shift beginning at 11:30 p.m. on March 1 and concluding at 8:00 a.m. on March 2.  (ECF No. 46-2 ¶ 51.)  At 7:31 a.m. on March 2 — twenty-nine minutes before the conclusion of his shift that day — Plaintiff left work to attend a physical therapy appointment for his knee.  (ECF No. 46-1 ¶ 77; ECF No. 46-2 ¶ 52.)  Defendant assessed Plaintiff two attendance-related points as a result.  (ECF No. 46-1 ¶ 78; ECF No. 46-2 ¶ 37.)  Plaintiff asserts that these two attendance-related points were unfairly and "unjustifiably" added to his record because Plaintiff received permission from his supervisor — an individual named Jeff Heide who held the position of Lead Clerk — to leave his shift early on March 2.  (ECF No. 46-1 ¶¶ 76–78; ECF No. 46-2 ¶ 52.)  Defendant, for its part, points out that Plaintiff did not follow proper procedure to ensure he would not be penalized for leaving his shift early on March 2: first, he failed to check what time his shift ended on March 2 before scheduling his physical therapy appointment for that date; second, he failed to submit a physician's note to Defendant regarding the appointment.  (ECF No. 46-1 ¶ 78; ECF No. 43-6 at 80.)  Though the parties dispute how many attendance-related points Plaintiff had accrued as of the time he received this two-point assessment for his early departure on March 2, they do not dispute that Plaintiff had accrued more than fifteen such points in a twelve-month period.  (ECF No. 46-1 ¶ 81; ECF No. 43-4 at 6.)

///

///

///

7

1                          *v.*        *Termination of Plaintiff's Employment*

Matters came to a head on March 10, 2015, when Plaintiff worked the overnight shift that began at 11:28 p.m. on March 9. (ECF No. 46-2 ¶ 62.)

At 3:55 a.m. on March 10, Heide requested that Plaintiff fill the Modesto store's shopping cart room. (ECF No. 46-2 ¶ 63.) Heide's directive required that Plaintiff fill the shopping cart room with approximately two hundred shopping carts that had been left outside Defendant's Modesto store. (ECF No. 46-2 ¶¶ 64–65.) Heide gave this directive to Plaintiff approximately five minutes before the time of day when Plaintiff typically took his lunch break (ECF No. 46-2 ¶¶ 63, 71), and about thirty-five minutes before the time of day when Plaintiff was mandated to take his lunch break by California law and Defendant's workplace policy (ECF No. 46-1 ¶ 37; ECF No. 32 at 151; ECF No. 30-3 at 15). This was the first time Plaintiff had been given such an assignment at such a time of night. (ECF No. 46-2 ¶ 65.) Plaintiff performed the task as requested (ECF No. 46-2 ¶ 65), though he asserts that he was visibly limping while retrieving the carts (ECF No. 46-2 ¶ 67). Plaintiff eventually clocked out of his shift for his lunch break at 4:32 a.m. (ECF No. 46-2 ¶ 70.) The parties characterize this as a "fifth hour violation" because it meant that Plaintiff had failed to take his lunch break prior to the commencement of his fifth hour of working, in violation of California law and Defendant's workplace policy. (ECF No. 46-1 ¶¶ 82–83.)

Plaintiff's employment was terminated on March 10, 2015. (ECF No. 46-1 ¶ 38.) The parties do not dispute that one of Defendant's reasons for Plaintiff's termination was the "fifth hour violation" that occurred in the early morning hours of March 10. (ECF No. 46-1 ¶¶ 38, 83.) The parties differ, however, on Defendant's second rationale for terminating Plaintiff's employment. Defendant characterizes the second rationale for Plaintiff's termination as being Plaintiff's incomplete shift on March 2, 2015. (ECF No. 46-1 ¶¶ 38, 83.) For his part, Plaintiff characterizes the second rationale for his termination as being his accumulation of seven attendance-related points in a three-month period and sixteen attendance-related points in a twelve-month period. (ECF No. 46-1 ¶¶ 38, 83.)

///

**B.    Procedural Background**

2        Plaintiff did not file a grievance relating to this or any other employment-related issue

3    during the time he worked for Defendant.  (ECF No. 46-1 ¶ 39.)  However, on May 8, 2015,

4    Plaintiff filed a charge of discrimination with the California Department of Fair Employment and

5    Housing (hereafter, "DFEH").  (ECF No. 46-1 ¶ 93; ECF No. 43-6 at 6–8.)  Plaintiff requested

6    and received a right-to-sue letter on that same day.  (ECF No. 43-6 at 4.)

7        On May 14, 2015, Plaintiff filed a lawsuit in the Superior Court of the State of California,

8    County of Stanislaus.  (ECF No. 5 ¶ 2.)  This state-court complaint raises eight causes of action:

9    (i) disability discrimination, in violation of California's Fair Employment and Housing Act

10    (hereafter, "FEHA") (ECF No. 5-1 ¶¶ 13–24); (ii) failure to accommodate Plaintiff's disability, in

11    violation of FEHA (ECF No. 5-1 ¶¶ 25–29); (iii) failure to engage in an interactive process with

12    Plaintiff in order to provide him with a reasonable employment accommodation, in violation of

13    FEHA (ECF No. 5-1 ¶¶ 30–35); (iv) retaliation for protected conduct, in violation of FEHA (ECF

14    No. 5-1 ¶¶ 36–46); (v) intentional infliction of emotional distress (ECF No. 5-1 ¶¶ 47–54);

15    (vi) failure to take reasonable steps to prevent workplace discrimination, in violation of FEHA

16    (ECF No. 5-1 ¶¶ 55–61); (vii) wrongful termination in violation of California public policy (ECF

17    No. 5-1 ¶¶ 62–67); and (viii) violation of Plaintiff's rights under the FMLA (ECF No. 5-1 ¶¶ 68–

18    72).  Defendant removed the suit to this Court in July 2015 (*see* ECF No. 1), and moved for

19    summary judgment on all claims in May 2017 (*see* ECF No. 30).

20    **II.    STANDARD OF LAW**

21        Summary judgment is appropriate where the moving party demonstrates that no genuine

22    issue as to any material fact exists and the moving party is entitled to judgment as a matter of law.

23    Fed. R. Civ. P. 56(a); *see also Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157 (1970).  Under

24    summary judgment practice, the moving party "bears the initial responsibility of informing the

25    district court of the basis for its motion, and identifying those portions of 'the pleadings,

26    depositions, answers to interrogatories, and admissions on file, together with the affidavits, if

27    any,' which it believes demonstrate the absence of a genuine issue of material fact."  *Celotex*

28    *Corp. v. Catrett*, 477 U.S. 317, 323 (1986).

If the moving party meets its initial responsibility, the burden then shifts to the opposing party to establish that a genuine issue as to any material fact actually does exist. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 585–87 (1986); *First Nat'l Bank of Ariz. v. Cities Serv. Co.*, 391 U.S. 253, 288–89 (1968). In attempting to establish the existence of this factual dispute, the opposing party is required to tender evidence of specific facts in the form of affidavits or admissible discovery material. Fed. R. Civ. P. 56(c). The opposing party must demonstrate that the fact in contention is material in the sense that it "might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The opposing party must also demonstrate that the dispute is such that a reasonable jury could return a verdict for the nonmoving party. *Id.* at 251–52.

In resolving a summary judgment motion, a district court examines the pleadings, depositions, answers to interrogatories, and admissions on file, together with any applicable affidavits. Fed. R. Civ. P. 56(c); *SEC v. Seaboard Corp.*, 677 F.2d 1301, 1305–06 (9th Cir. 1982). The evidence of the opposing party is to be believed, and all reasonable inferences that may be drawn from the facts pleaded before the court must be drawn in favor of the opposing party. *Anderson*, 477 U.S. at 255 (citing *Adickes*, 398 U.S. at 158–59). Nevertheless, inferences are not drawn out of the air, and it is the opposing party's obligation to produce a factual predicate from which an inference may be drawn. *Richards v. Nielsen Freight Lines*, 602 F. Supp. 1224, 1244–45 (E.D. Cal. 1985), *aff'd,* 810 F.2d 898 (9th Cir. 1987). "Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge," when ruling on a motion for summary judgment. *Anderson*, 477 U.S. at 255. Finally, to demonstrate a genuine issue that necessitates a jury trial, the opposing party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita*, 475 U.S. at 586. "Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no 'genuine issue for trial.'" *Id.* at 587 (quoting *First Nat'l Bank of Ariz.*, 391 U.S. at 289). Indeed, if a party "fails to properly address another party's assertion of fact," a district court may "consider the fact undisputed for purposes of the motion" or may "grant summary judgment if the motion and supporting materials

— including the facts considered undisputed — show that the movant is entitled to it." Fed. R. Civ. P. 56(e).

## III.    ANALYSIS

### A.    Evidentiary Objections

As a preliminary matter, the Court will address evidentiary objections lodged by the parties only to evidence upon which the Court relied in considering and preparing this Order.

#### i.    *"Mischaracterization" Objections*

Defendant lodged numerous objections to the characterization of many of the purportedly undisputed facts provided by Plaintiff.  (*See, e.g.*, ECF No. 46-2 ¶¶ 52–59.)  The Court categorically overrules Defendant's mischaracterization objections because they are merely disputes about the meaning of certain facts that are styled as evidentiary objections.  *See Cooper v. United Air Lines, Inc.*, 82 F. Supp. 3d 1084, 1098 (N.D. Cal. 2015) ("Defendant's objections that Plaintiff has in numerous places mischaracterized the record or deposition testimony are overruled as the Court is able to view the deposition testimony and other evidence and evaluate both on its own.").

#### ii.    *Blanket Hearsay Objections*

Defendant lodged a number of blanket hearsay objections to items of evidence identified in Plaintiff's separate statement of facts, but these objections fail to identify which exact pieces of evidence are supposedly inadmissible hearsay.  (*See, e.g.*, ECF No. 46-2 ¶ 66.)  The Court categorically overrules any such blanket hearsay objections that are not directed to specific items of evidence.  *See Hunter v. White*, No. 1:13-cv-01681-DAD-GSA-PC, 2018 WL 2329219, at *3 (E.D. Cal. May 23, 2018) ("The court finds Defendant's hearsay objections to be 'boilerplate recitations of evidentiary principles or blanket objections without analysis applied to specific items of evidence,' which should be rejected." (quoting *Stonefire Grill, Inc. v. FGF Brands, Inc.*, 987 F. Supp. 2d 1023, 1033 (C.D. Cal. 2013))); *Ramsey v. Siskiyou Hosp., Inc.*, No. 2:14-cv-01908-KJM-CMK, 2016 WL 3197557, at *1 (E.D. Cal. June 9, 2016) (rejecting many evidentiary objections on same grounds).

///

*iii.*     *Hearsay Objection to Paragraph 28 of Plaintiff's Separate*

*Statement of Facts*

Defendant objects on hearsay grounds to paragraph 28 of Plaintiff's separate statement of facts. (*See* ECF No. 46-2 ¶ 28.) Paragraph 28 cites to portions of Plaintiff's deposition and reads, in its entirety: "At no point in time did Ms. Amaral ask Plaintiff to clarify what 'modified duties' meant." (ECF No. 46-2 ¶ 28.) To the extent Defendant's objection is directed at the substantive text of paragraph 28 transcribed in the previous sentence of this Order, the Court overrules this objection because that text is not an out-of-court statement offered to prove the truth of what it asserts, nor is it nonverbal conduct that Amaral intended as an assertion. *See* Fed. R. Evid. 801(a) ("'Statement' means a person's oral assertion, written assertion, or nonverbal conduct, if the person intended it as an assertion."). The text of paragraph 28 is not a statement (or nonverbal conduct intended as a statement) at all because it simply describes the absence of a statement by anyone employed by Defendant.

To the extent Defendant's objection is directed at Plaintiff's deposition testimony describing the particulars of what Amaral said to Plaintiff after he submitted his request for modified duties to accommodate his knee injury, the Court also overrules that objection. A statement is not hearsay if it is offered against an opposing party and "was made by the party's agent or employee on a matter within the scope of that relationship and while it existed." Fed. R. Evid. 801(d)(2)(D); *see United States v. Bonds*, 608 F.3d 495, 502 (9th Cir. 2010) ("Subsection (D) authorizes admission of any statement against a party, but only provided it is made within the scope of an employment or agency relationship."). The record contains evidence suggesting that Amaral was Defendant's employee and was the point person for Plaintiff to speak with regarding any requests for workplace accommodation. (*See* ECF No. 43-6 at 90–91; ECF No. 32 at 185–88; ECF No. 46-2 ¶ 23 (equating the provision of a physician's note to Amaral with the provision of said note to Defendant itself).) And though there are some indications in the record that Amaral was not employed by Defendant to discuss accommodation-related matters with other employees (*see* ECF No. 43-6 at 135), this evidence is not strong enough to overcome the documentary evidence showing that Amaral and others in similar positions did, in fact, process

workplace accommodation requests and serve as points of contact for Plaintiff when he requested accommodation (*see* ECF No. 32 at 181–88; ECF No. 32-1 at 27, 36, 81).

Accordingly, statements made by Amaral regarding Plaintiff's request for accommodation were made within the scope of her employment relationship with Defendant, and therefore qualify as non-hearsay pursuant to Rule 801(d)(2)(D) of the Federal Rules of Evidence. *Bonds*, 608 F.3d at 502.

### iv. *Declaration of Margarita Garcia*

Plaintiff objects to the entire declaration of Margarita Garcia on grounds that Garcia was not properly disclosed during discovery as a person with knowledge of facts relevant to the instant matter. (ECF No. 43-9 ¶ 1.) Defendant appears to concede that Garcia's identity as a potentially relevant witness was not formally disclosed during discovery, but nonetheless argues that Plaintiff was constructively on notice of Garcia's identity and her potentially relevant knowledge. (ECF No. 46-5 ¶ 1.) Defendant also asserts that any failure to formally disclose Garcia's identity during discovery was harmless because the primary purpose of her declaration is primarily to authenticate documentary evidence to which Plaintiff cannot reasonably object. (ECF No. 46-5 ¶ 1.)

It is beyond dispute that the Federal Rules of Civil Procedure require parties to disclose the name of each individual likely to have discoverable information. Fed. R. Civ. P. 26(a)(1)(A). Failure to do so can preclude the delinquent party from relying on the undisclosed witness or information at summary judgment, unless the nondisclosure was substantially justified or harmless. Fed. R. Civ. P. 37(c)(1); *Yeti by Molly, Ltd. v. Deckers Outdoor Corp.*, 259 F.3d 1101, 1106 (9th Cir. 2001) ("Two express exceptions ameliorate the harshness of Rule 37(c)(1): The information may be introduced if the parties' failure to disclose the required information is substantially justified or harmless."). The burden to demonstrate substantial justification or harmlessness is on the party that failed to disclose. *Id.* at 1107. Five factors inform the district court's analysis of whether a party's failure to disclose a potential witness was harmless: "1) the public's interest in expeditious resolution of litigation; 2) the court's need to manage its docket; 3) the risk of prejudice to the [non-disclosing party]; 4) the public policy favoring disposition of

cases on their merits; 5) the availability of less drastic sanctions." *Wendt v. Host Int'l, Inc.*, 125 F.3d 806, 814 (9th Cir. 1997).

Here, the first, second, and fifth factors are essentially irrelevant to Defendant's failure to disclose Garcia in accordance with the requirements of Rule 26 of the Federal Rules of Civil Procedure, so the Court will not discuss them. *See id.* The third factor — risk of prejudice to Plaintiff as the non-disclosing party — weighs only somewhat in favor of sustaining Plaintiff's objection. Though Defendant argues that the risk of prejudice is somewhat limited here because Plaintiff and his counsel became familiar with Garcia's role in Defendant's corporate structure in the course of discovery (ECF No. 46-5 ¶ 1 (noting that Garcia's name was mentioned as an employee of Defendant who worked in the corporate office)), the deposition during which Garcia's name was mentioned occurred only six days before the fact discovery deadline (ECF No. 46-5 ¶ 1 (asserting that the relevant deposition occurred on November 16, 2016); ECF No. 24 at 4 (setting the fact discovery deadline for November 22, 2016)). Thus, though it is technically true that Plaintiff knew that Garcia would be a potentially relevant witness at some point during the litigation, Plaintiff only found out about Garcia when there was insufficient time to notice Garcia's deposition or serve interrogatories focused on Garcia's role. *See Van Maanen v. Youth With a Mission-Bishop*, 852 F. Supp. 2d 1232, 1237 (E.D. Cal. 2012) (refusing to strike a declaration submitted in support of a summary judgment motion where the declarant's "identity, position, location, and the subject of the information he possessed were made known to Plaintiff through" other depositions in the case because those depositions occurred more than a month before the discovery cutoff), *aff'd sub nom. Van Maanen v. Univ. of the Nations, Inc.*, 542 F. App'x 581 (9th Cir. 2013).

The public policy favoring disposition of cases on their merits weighs more heavily in favor of overruling Plaintiff's objection. The primary purpose of Garcia's declaration — and the context in which the Court relied on that declaration — is the authentication of documents from Defendant's employment records. (*See* ECF No. 32-1 at 11–168.) A district court may exercise its discretion to consider materials authenticated by a declarant who was not properly disclosed because such consideration is harmless. *See Lam v. City & Cty. of S.F.*, 565 F. App'x 641, 643

1  (9th Cir. 2014) (citing Fed. R. Civ. P. 37(c)(1); *Beauperthuy v. 24 Hour Fitness USA, Inc.*, 772 F.

2  Supp. 2d 1111, 1120 (N.D. Cal. 2011)).  Since Plaintiff does not object to the authenticity of the

3  documents and records referenced in Garcia's declaration, and since considering these documents

4  as evidence will assist the Court in ruling on Defendant's summary judgment motion, the public

5  policy in favor of disposing cases on their merits weighs against Plaintiff's objection.  (*See* ECF

6  No. 46-5 ¶ 1 (objecting to Garcia's declaration only on failure-to-disclose grounds).)

7      For the foregoing reasons, the Court partially sustains and partially overrules Plaintiff's

8  objection.  The Court will consider documentary evidence authenticated by Garcia's declaration

9  because doing so is harmless.  *See Lam*, 565 F. App'x at 643.  At the same time, the Court will

10  not consider any substantive evidence contained in the declaration itself because Defendant fails

11  to carry its burden to demonstrate that its failure to disclose Garcia was substantially justified or

12  harmless.  *See Yeti by Molly, Ltd.*, 259 F.3d at 1106.

13                    *v.        Declaration of Bradley Fulfer*

14      Defendant objects to much of the declaration submitted by Plaintiff alongside his

15  opposition papers.  (ECF No. 46-3.)  The Court adjudicates only those objections which are

16  directed at evidence upon which the Court relied in ruling on Defendant's motion.

17                    a.        Paragraph 8

18      Defendant objects to paragraph 8 as being contradictory to Plaintiff's deposition

19  testimony.  (ECF No. 46-3 ¶ 3.)

20      The Court overrules this objection because Defendant makes no effort to demonstrate why

21  the contents of this paragraph are inadmissible under the Federal Rules of Evidence or any other

22  evidentiary doctrine.  (*See* ECF No. 46-3 ¶ 3); Fed. R. Civ. P. 56(c)(4) (requiring declarations

23  used to oppose a summary judgment motion to "set out facts that would be admissible in

24  evidence").  And even if it were required to reach the merits of Defendant's objection, the Court

25  would overrule it because Plaintiff testified at his deposition that he "asked [Amaral] to be placed

26  on light duty," which is consistent with the contents of paragraph 8 of his declaration even though

27  that paragraph is more detailed and expansive.

28  ///

b.     Paragraph 17

Defendant objects to paragraph 17 on grounds that it contains an improper legal conclusion under Rule 704 of the Federal Rules of Evidence, that it lacks foundation under Rule 602, and that it contradicts Plaintiff's prior deposition testimony. (ECF No. 46-3 ¶ 10.)

It is beyond dispute that a witness may only testify to a matter "if evidence is introduced sufficient to support a finding that the witness has personal knowledge of the matter." Fed. R. Evid. 602. That being said, "the requirement of personal knowledge imposes only a 'minimal' burden on a witness; if 'reasonable persons could differ as to whether the witness had an adequate opportunity to observe, the witness's testimony is admissible.'" *Strong v. Valdez Fine Foods*, 724 F.3d 1042, 1045 (9th Cir. 2013) (quoting 1 Charles McCormick, *McCormick on Evidence* § 10 (Kenneth S. Broun, ed., 7th ed. 2013)). Furthermore, the personal knowledge bar at summary judgment "is particularly low because all 'justifiable inferences' must be drawn in favor of the nonmoving party." *Id.* (quoting *Anderson*, 477 U.S. at 255). Also, a lay witness "may testify only to 'those opinions or inferences which are (a) rationally based on the perception of the witness and (b) helpful to a clear understanding of the witness' testimony or the determination of a fact in issue.'" *United States v. Crawford*, 239 F.3d 1086, 1090 (9th Cir. 2001) (quoting Fed. R. Evid. 701). "A lay witness may testify as to an ultimate issue of fact, so long as the testimony is otherwise admissible." *Id.* (citing Fed. R. Evid. 704). "The lay witness may not, however, testify as to a legal conclusion . . . ." *Id.* (citing *Evangelista v. Inlandboatmen's Union of Pac.*, 777 F.2d 1390, 1398 n.3 (9th Cir. 1985)).

The Court overrules Defendant's objection to paragraph 17 of Plaintiff's declaration to the extent it is purported to lack the requisite personal knowledge or contain a legal conclusion. This paragraph contains information that relates directly to Plaintiff's own employment and leave situation, a situation about which Plaintiff almost certainly has personal knowledge since it directly affects his own life. (*See* ECF No. 43-6 ¶¶ 1–2.) Second, it is not a legal conclusion for Plaintiff to declare that he intended to avail himself of any FMLA leave which he had available. Plaintiff does not need to exercise legal judgment in order to tell his supervisors that he himself intended to do something in the future.

The Court also overrules Defendant's objection on grounds that it contradicts Plaintiff's deposition testimony. The relevant component of Plaintiff's evidence as set forth in paragraph 17 of his declaration is that he informed his supervisors in March of 2015 that he wished to have his knee injury accommodated by being trained to become a cashier, and Plaintiff's deposition testimony was consistent with this. (*See* ECF No. 43-6 at 98–99.) And while it may be true that Plaintiff also testified at his deposition that he could not recall whether he ever specifically spoke to Heide about becoming a cashier (*see* ECF No. 43-6 at 99), that does not necessarily make paragraph 17 of Plaintiff's declaration so contradictory as to be inadmissible, *see Van Asdale v. Int'l Game Tech.*, 577 F.3d 989, 999 (9th Cir. 2009) (holding that a "non-moving party is not precluded from elaborating upon, explaining or clarifying prior testimony elicited by opposing counsel on deposition [and] minor inconsistencies that result from an honest discrepancy, a mistake, or newly discovered evidence afford no basis for excluding an opposition affidavit" (alteration in original) (quoting *Messick v. Horizon Indus.*, 62 F.3d 1227, 1231 (9th Cir. 1995))).

### c. Paragraph 20

Defendant objects to paragraph 20 of Plaintiff's declaration on grounds that it (i) lacks foundation under Rule 602 of the Federal Rules of Evidence, (ii) contains inadmissible hearsay, (iii) contains an improper lay opinion under Rule 701, and (iv) contradicts his prior deposition testimony. (ECF No. 46-3 ¶ 13.)

Defendant's objection predicated on improper witness testimony is overruled because the Court can locate no opinion in paragraph 20 of Plaintiff's declaration that would implicate Rule 701. (*See* ECF No. 46-3 ¶ 13.)

Defendant's objections predicated on hearsay and contradictory testimony are overruled. First, there is no indication that paragraph 20 incorporates any out-of-court statements offered for their truth, as would be required for evidence to be made inadmissible by operation of the rule against hearsay. *See* Fed. R. Evid. 801(a) ("'Statement' means a person's oral assertion, written assertion, or nonverbal conduct, if the person intended it as an assertion."); *Fraser v. Goodale*, 342 F.3d 1032, 1036 (9th Cir. 2003) ("At the summary judgment stage, we do not focus on the admissibility of the evidence's form. We instead focus on the admissibility of its contents."

(citing *Block v. City of L.A.*, 253 F.3d 410, 418–19 (9th Cir. 2001))).  Second, Defendant's citation to Plaintiff's deposition testimony does not demonstrate what Defendant says it demonstrates, namely that Plaintiff "was allotted points for every unprotected incomplete shift that he worked."  (ECF No. 46-3 ¶ 13.)  Therefore, the assertion in paragraph 20 of Plaintiff's declaration that he frequently left work early without being disciplined does not contradict his prior deposition testimony.  *See Van Asdale*, 577 F.3d at 999 (holding that a "non-moving party is not precluded from elaborating upon, explaining or clarifying prior testimony elicited by opposing counsel on deposition [and] minor inconsistencies that result from an honest discrepancy, a mistake, or newly discovered evidence afford no basis for excluding an opposition affidavit" (alteration in original) (quoting *Messick*, 62 F.3d at 1231)).

Defendant's objection predicated on lack of foundation under Rule 602 is sustained in part and overruled in part.  A witness may testify to a matter "only if evidence is introduced sufficient to support a finding that the witness has personal knowledge of the matter."  Fed. R. Evid. 602.  There is no indication here that Plaintiff has personal knowledge of the manner in which other employees were treated when they departed work early.  Accordingly, Defendant's objection is sustained to the extent it challenges the foundation for Plaintiff's statement that leaving work early without being disciplined "was commonly done by other employees at WinCo."  (ECF No. 46-3 ¶ 13.)  Defendant's objection is overruled, however, to the extent it attacks paragraph 20's foundation for Plaintiff's statement that he himself left work early on numerous occasions without being disciplined.  (ECF No. 46-3 ¶ 13.)  Plaintiff certainly has personal knowledge of his own employment and discipline history.  (*See* ECF No. 43-3 ¶¶ 1–2.)  Furthermore, to the extent Plaintiff "fails to explain the specifics as to why we [sic] left work early on some occasions, whether it was excused, and/or whether it was because his work shift ended early," these deficiencies go to the weight, not the admissibility, of Plaintiff's proffered evidence.  (ECF No. 46-3 ¶ 13.)

### B.     Disability Discrimination in Violation of FEHA

Defendant urges the Court to grant summary judgment in its favor on Plaintiff's FEHA disability discrimination claim, arguing that Plaintiff cannot establish a *prima facie* case of

18

disability discrimination because (i) Plaintiff was not disabled, and (ii) Plaintiff presented no

evidence of a discriminatory motive for his termination.  (ECF No. 42-1 at 17–20.)  Plaintiff

argues that summary judgment is not appropriate because the evidence demonstrates that

(i) Plaintiff was disabled under FEHA because his knee injury limited his ability to engage in the

major life activity of walking and working, and (ii) Plaintiff's termination was due to his conduct

that related to his knee injury.  (ECF No. 43 at 13–17.)  The parties also dispute whether there is

evidence creating a genuine dispute of material fact as to whether the reasons Defendant gave for

terminating Plaintiff's employment were pretextual.  (ECF No. 42-1 at 20; ECF No. 43 at 17–19.)

The elements of a *prima facie* claim of disability discrimination under FEHA are that the

plaintiff (i) suffers from a disability, (ii) is otherwise qualified to do his or her job, and (iii) was

subjected to adverse employment action because of his or her disability.  *Nigro v. Sears, Roebuck*

*& Co.*, 784 F.3d 495, 497 (9th Cir. 2015).  Claims for relief brought pursuant to FEHA are

subject to a three-step burden-shifting analysis.  *Alamillo v. BNSF Ry. Co.*, 869 F.3d 916, 920 (9th

Cir. 2017).  Hence,

> [o]n a motion for summary judgment . . . the plaintiff bears the burden of establishing a prima facie case of discrimination based upon physical disability, and the burden then shifts to the employer to offer a legitimate, nondiscriminatory reason for the adverse employment action.  Once the employer has done so the plaintiff must offer evidence that the employer's stated reason is either false or pretextual, or evidence that the employer acted with discriminatory animus, or evidence of each which would permit a reasonable trier of fact to conclude the employer intentionally discriminated.

*Id.* (second alteration in original) (quoting *Faust v. Cal. Portland Cement Co.*, 58 Cal. Rptr. 3d

729, 745 (Ct. App. 2007)).  When applying this burden-shifting analysis, a district court must

keep in mind that "[i]t should not take a whole lot of evidence to establish a genuine issue of

material fact in a disability discrimination case, at least where the fact issue on discrimination is

genuine and the disability would not preclude gainful employment of a person working with

accommodation."  *Nigro*, 784 F.3d at 499.

### i. Presence of a Physical Disability

With respect to the requirement that a plaintiff claiming disability discrimination must

first establish the existence of a disability, FEHA defines a "[p]hysical disability" broadly as having any physiological condition that (i) affects the body's systems (including the musculoskeletal system) and (ii) limits a major life activity, defined as "physical, mental, and social activities and working." Cal. Gov't Code § 12926. A plaintiff is not necessarily required to tender medical evidence to establish a genuine issue of material fact regarding the impairment of a major life activity at the summary judgment stage. *Rohr v. Salt River Project Agric. Improvement & Power Dist.*, 555 F.3d 850, 858–59 (9th Cir. 2009) (citing *Head v. Glacier Nw., Inc.*, 413 F.3d 1053, 1058 (9th Cir. 2005), *overruled on other grounds by Murray v. Mayo Clinic*, 934 F.3d 1101 (9th Cir. 2019)). Accordingly, a plaintiff's affidavit alone — so long as it is not merely self-serving and contains sufficient detail — may suffice to defeat summary judgment on the question of disability. *Id.* at 859 (citing *Head*, 413 F.3d at 1059).

According to Defendant, Plaintiff cannot establish the first element of his disability discrimination claim because there is no evidence he was disabled under FEHA at the time of his termination. Defendant's argument in this regard relies primarily on the fact that when Plaintiff incurred attendance-related violations on March 2 and March 10, 2015, he had — at least according to the "Fitness for Duty Certification" form that Dr. Modi had signed and transmitted to Defendant's leave administrator — returned to work with no physical restrictions. (ECF No. 42-1 at 18.) The implication is that Dr. Modi's medical judgment that Plaintiff was healthy enough to work without restrictions should prevail over Plaintiff's later protestations that he was, in fact, still injured in March 2015. According to Plaintiff, this emphasis on Dr. Modi's "Fitness for Duty Certification" form ignores the substantial other evidence that Plaintiff's knee made it painful and difficult for him to perform his job without accommodations. (ECF No. 43 at 14.)

The Court finds that there is enough evidence in the record to create a genuine factual dispute regarding whether Plaintiff was disabled within the meaning of FEHA at the time of his termination. First, Plaintiff testified at his deposition that when he returned to work in February and March 2015, he continued to experience pain in his knee and informed his supervisors as such. (ECF No. 43-6 at 81, 91–92, 94, 100.) Plaintiff spoke with his supervisors more than once during this time period about his need to attend physical therapy appointments for his knee. (*E.g.*,

ECF No. 43-6 at 77 (regarding Plaintiff's March 2 appointment), 79 (regarding Plaintiff's March 4 appointment).)  Plaintiff also testified at his deposition that he wore a knee brace that was visible to his supervisors "at some point in time."  (ECF No. 43-6 at 94–95.)  This temporal uncertainty about the knee brace is clarified by Plaintiff's declaration, in which he states that he wore this visible knee brace after returning to work in March 2015.  (ECF No. 43-3 at 3.)  Far from "contradicting prior, sworn deposition testimony" Plaintiff gave about the status of his injury in March 2015, as Defendant contends (ECF No. 46-2 ¶¶ 48–49), Plaintiff's declaration simply provides details of when he appeared at work wearing a knee brace, *see Rohr*, 555 F.3d at 859 (holding that to survive summary judgment, an affidavit supporting the existence of a disability only need contain sufficient detail to convey the existence of an impairment).  Furthermore, Plaintiff's declaration clarifies that he wore this visible knee brace during the very period of time when Defendant argues that Plaintiff was not actually disabled.  (ECF No. 42-1 at 18–19.)

Second, Defendant's reliance on Dr. Modi's paperwork to prove the absence of a genuine dispute regarding Plaintiff's disability is misplaced, because that very paperwork is at best unclear about whether Plaintiff was cleared to work without restrictions in March 2015.  (*See* ECF No. 42-1 at 18–19.)  Dr. Modi did testify during his deposition that his office gave Defendant a "Fitness for Duty Certification" form in late February that purported to release Plaintiff to work with no restrictions, but Dr. Modi also testified that his office gave Defendant the "California Certification of Health Care Provider for Employee's or Family Member's Serious Health Condition" form at the same time.  (ECF No. 32 at 238.)  This latter form quite clearly stated that Plaintiff was "unable to perform any one or more of the essential functions of [his] position." (ECF No. 32 at 263.)  Defendant does not raise any credible assertion that one piece of paper it received from Dr. Modi regarding Plaintiff's physical condition was any more reliable or compelling than another contradictory piece of paper it received from the same source at the same time.  (*See* ECF No. 42-1 at 18–19 (containing no reference to the "California Certification of Health Care Provider for Employee's or Family Member's Serious Health Condition" form).)

Defendant makes much of the fact that Plaintiff "admits that he never asked for or obtained a doctor's note providing him with any restrictions, or taking him off work for an additional period of time." (ECF No. 42-1 at 18.) The implication is that had Plaintiff actually been injured in February and March 2015, he would have obtained a note from Dr. Modi verifying as such. But the very portion of Plaintiff's deposition that Defendant cites for this proposition, when viewed alongside other evidence before the Court, reveals that Plaintiff had a reasonable explanation for why he never requested that Dr. Modi provide him with such a note in February or March 2015: because he needed to work to earn money (ECF No. 43-6 at 100), and based on his unfulfilled request to be trained as a cashier, he believed that Defendant was unlikely to allow him to work in a less physically demanding capacity (ECF No. 43-6 at 92–94). This produces a garden-variety dispute of material fact because there is evidence on which a reasonable jury could either credit Defendant's theory (that the lack of a physician's note in March 2015 means Plaintiff was not actually injured during that time), or could credit Plaintiff's theory (that he tried to work through his knee pain without a doctor's note because he needed money and felt that he had no alternative). A jury, not this Court, must weigh these conflicting pieces of evidence regarding the legitimacy of Plaintiff's injury. *See Anderson*, 477 U.S. at 255 ("Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge . . . .").

And in any event, Defendant cites no authority for the proposition that FEHA requires an employee to provide medical documentation confirming the existence of a covered disability when, as here, there is readily apparent indicia that the employee's ability to work is limited by a musculoskeletal injury. *See* Cal. Gov't Code § 12926 (defining the scope of a physical disability as having a physiological condition that limits a major life activity). Indeed, the only legal authority cited by the parties on this point is contrary to Defendant's contention that Plaintiff cannot establish the existence of a genuine dispute of fact regarding his disability because he lacks documentation from Dr. Modi. *See Rohr*, 555 F.3d at 859 (stating that establishing a triable issue regarding the existence of a disability may be done by proffering a non-self-serving declaration that contains "sufficient detail to convey the existence of an impairment" (quoting

*Head*, 413 F.3d at 1059)).

From this evidence viewed in the light most favorable to Plaintiff, a reasonable jury could conclude not only that Plaintiff was physically disabled in March 2015, but that his employer knew of that disability at the time. Therefore, Defendant is not entitled to summary judgment on its argument that Plaintiff was not disabled at the time his employment was terminated.

### ii. *Plaintiff's Qualification to Perform His Job*

Defendant raises the second element of Plaintiff's *prima facie* case — that Plaintiff was otherwise qualified to do his job, *see Nigro*, 784 F.3d at 497 — for the first time in its reply brief (*see* ECF No. 46 at 4). A district court "need not consider arguments raised for the first time in a reply brief." *Zamani v. Carnes*, 491 F.3d 990, 997 (9th Cir. 2007) (citing *Koerner v. Grigas*, 328 F.3d 1039, 1048 (9th Cir. 2003)). Consequently, the Court will not grant summary judgment for Defendant on the basis that Plaintiff failed to make out a *prima facie* case that he was qualified to perform the essential functions of his job.

### iii. *Disability as Substantial Motivating Factor for Termination*

With respect to the third element of a disability discrimination claim that requires a plaintiff to demonstrate termination due to said plaintiff's disability (i.e., causation), an employer discriminates against an employee "'because of' a disability when the disability is a substantial motivating reason for the employer's decision to subject the employee to an adverse employment action." *Alamillo*, 869 F.3d at 920 (quoting *Wallace v. Cty. of Stanislaus*, 199 Cal. Rptr. 3d 462, 475 (Ct. App. 2016)); *see also Humphrey v. Mem'l Hosps. Ass'n*, 239 F.3d 1128, 1139–40 (9th Cir. 2001) (in case brought pursuant to Americans With Disabilities Act ("ADA"), holding that "conduct resulting from a disability is considered to be part of the disability, rather than a separate basis for termination").[1] "The link between the disability and termination is particularly strong where it is the employer's failure to reasonably accommodate a known disability that leads to discharge for performance inadequacies resulting from that disability." *Id.* at 1140 (citing *Borkowski v. Valley Cent. Sch. Dist.*, 63 F.3d 131, 143 (2d Cir. 1995)).

---

[1] Courts deciding FEHA cases frequently and properly rely on cases interpreting the ADA because "the FEHA provisions relating to disability discrimination are based on the ADA." *Humphrey*, 239 F.3d at 1133 n.6.

Defendant argues that Plaintiff "cannot establish a *prima facie* claim of disability discrimination because he cannot show that WinCo terminated him **because** of his disability." (ECF No. 42-1 at 19.)  This argument relies on Defendant's characterization of Plaintiff's termination as being predicated solely on his "back-to-back violations in March 2015" of Defendant's attendance policy, in which Plaintiff accumulated an abundance of attendance-related points.  (ECF No. 42-1 at 19.)  To support this argument, Defendant again relies on Dr. Modi's "Fitness for Duty Certification" form as evidence that Plaintiff's employment in March 2015 was without any physical restrictions, with the implication being that Defendant could not have terminated Plaintiff because of a disability that Plaintiff's own physician said was not affecting his ability to work.  (ECF No. 42-1 at 20.)  Defendant also points out that Plaintiff was scheduled to work a full 39.5-hour shift during the week he returned to work in March 2015, which demonstrates that there was no discriminatory animus on Defendant's part to attempt to push him out by limiting his hours.  (ECF No. 42-1 at 20.)

Plaintiff attempts to create a genuine dispute of fact on this causation element by arguing that the last seven attendance points he incurred were "clearly as a result of his knee condition and his need to treat his disability."  (ECF No. 43 at 17.)  As support for this argument, Plaintiff cites to four main pieces of evidence.  First, Plaintiff points to evidence that he was assessed three disciplinary points for absences incurred between January 22 and January 29, 2015, even though Plaintiff provided Defendant's representatives with a note from Dr. Modi asking that he be placed on modified duties during that time-frame.  (ECF No. 43 at 17 (citing ECF No. 46-2 ¶ 22); *see also* ECF No. 46-2 ¶¶ 23, 26 (demonstrating Defendant's knowledge of Plaintiff's request for modified duties in late January 2015).)  Defendant responds that these three points were properly assessed because "Unum's documentation stated that a date was not reported between January 22, 2015, through January 29, 2015."  (ECF No. 46 at 5.)  Second, Plaintiff cites to evidence that Defendant assessed him two attendance-related points on January 30, 2015 after his knee swelled up and forced him to abandon his shift early.  (ECF No. 43 at 17 (citing ECF No. 46-2 ¶ 37).)  Third, Plaintiff cites evidence that on March 2, 2015, he was assessed two additional attendance-related points when he left work early for a physical therapy appointment, even though his

supervisor Heide gave him permission to attend this appointment. (ECF No. 43 at 17 (citing ECF No. 46-2 ¶ 52).) Defendant responds that this evidence does not create a genuine dispute of fact regarding the reason for Plaintiff's termination because Plaintiff has no evidence that he submitted a doctor's note to ensure that his leaving work early on March 2 was protected. (ECF No. 46 at 5.) Fourth, Plaintiff points to the sequence of events on March 10, 2015, involving Heide's request that Plaintiff refill the cart room, a request that was lodged five minutes before Plaintiff typically took his lunch break and which caused Plaintiff to clock out for that break two minutes late. (ECF No. 46-2 ¶¶ 63–67, 70.) Defendant responds that this evidence is not enough to create a genuine dispute of fact because "Plaintiff has admitted that he does not know whether or not any other employee was ever sent out by themselves to collect carts at or around 4:00 a.m., and Plaintiff further admits that he could have taken his lunch break at any time between his second and fifth hour of work." (ECF No. 46 at 4–5.)

There is no dispute that between January and March of 2015 Plaintiff was penalized at least four separate times for attendance-related infractions. Keeping in mind that the "link between the disability and termination is particularly strong where it is the employer's failure to reasonably accommodate a known disability that leads to discharge for performance inadequacies resulting from that disability," the Court finds that Plaintiff's evidence is sufficient to carry his initial burden to create a genuine dispute about Defendant's motivation for terminating him. *Humphrey*, 239 F.3d at 1140 (citing *Borkowski*, 63 F.3d at 143). The performance inadequacies in this case were Plaintiff's attendance-related violations (*see* ECF No. 42-1 at 16 ("Plaintiff was terminated for his incomplete shift and violation of WinCo's Attendance Policy on March 2, 2015, as well as his fifth hour violation on March 10, 2015.")), and Plaintiff presents evidence that these violations were caused by his supervisors' refusal to reasonably accommodate his knee injury (*see, e.g.* ECF No. 46-2 ¶¶ 22, 37, 52; ECF No. 32 at 25, 27, 72). A jury might find that it would have been reasonable for Defendant to lower Plaintiff's case count or reassign him to a different position upon receipt of Dr. Modi's note from January 2015, in which Dr. Modi requested that Plaintiff be placed on modified duties, but Defendant did not do so. (*See* ECF No. 46-1 ¶¶ 60–61; ECF No. 32 at 68, 69.) A jury might also find that it would have been reasonable

for Plaintiff's supervisors not to assess him attendance-related points when he had to prematurely end his shifts on January 30 and March 2 due to the pain in his knee. (*See* ECF No. 46-2 ¶¶ 37, 52; ECF No. 32 at 27, 72.) And a jury certainly might find that it would have been reasonable for Heide to ask another employee or group of employees, those who were not known to be experiencing knee trouble, to retrieve shopping carts at 4:00 in the morning. (*See* ECF No. 46-2 ¶¶ 48–49, 66–67; ECF No. 32 at 37.)

Accordingly, Plaintiff carries his initial burden of producing facts sufficient to establish a *prima facie* case that Defendant was substantially motivated to terminate Plaintiff because of attendance points, and that it only assessed those attendance-related points in the first place because of Plaintiff's injury.

*iv.*      *Legitimate, Nondiscriminatory Reason for Termination*

Since Plaintiff has carried his initial burden, the burden now "shifts to the employer to offer a legitimate, nondiscriminatory reason for the adverse employment action." *Alamillo*, 869 F.3d at 920 (quoting *Faust*, 58 Cal. Rptr. 3d at 745). Defendant's burden is to show that the procedure by which Plaintiff was terminated "was validly and fairly devised and administered to serve a legitimate business purpose." *Dep't of Fair Emp't & Hous. v. Lucent Techs., Inc.*, 642 F.3d 728, 745–46 (9th Cir. 2011) (citing *Hanson v. Lucky Stores, Inc.*, 87 Cal. Rptr. 2d 487, 492 (Ct. App. 1999)). At the same time, where an employer's proffered nondiscriminatory reason for taking an adverse employment action is employee misconduct that results from a disability, such an "explanation, as a matter of law, fails to qualify as a legitimate, nondiscriminatory explanation for [the employee's] discharge." *Dark v. Curry Cty.*, 451 F.3d 1078, 1084 (9th Cir. 2006).

Defendant's nondiscriminatory reason for terminating Plaintiff consists of "Plaintiff's attendance violation (incomplete shift) on March 2, 2015, and fifth hour violation on March 10, 2015." (ECF No. 42-1 at 20.) Defendant argues that these violations, when viewed alongside its history of accommodating Plaintiff's previous leave requests and the absence of any indication that Plaintiff's previous disciplinary violations were discriminatory, preclude a finding of pretext. (ECF No. 42-1 at 20.) For his part, Plaintiff argues that Defendant fails to present a legitimate, nondiscriminatory reason for his termination because Defendant's justification for that

termination was attendance-related violations that flowed directly from Plaintiff's disability. (ECF No. 43 at 16.) According to Plaintiff, since "the last seven (7) attendance points assessed to Mr. Fulfer were clearly as a result of his knee condition and his need to treat his disability," Defendant cannot rely on those seven attendance-related points to meet its burden of producing a nondiscriminatory rationale for terminating him. (ECF No. 43 at 17.)

The Court finds that Defendant meets its burden to proffer a nondiscriminatory reason for Plaintiff's termination. Defendant presents evidence that it terminated Plaintiff for his incomplete shift on March 2, 2015, and for breaking the fifth-hour rule eight days later, both of which violated Defendant's attendance policies. (ECF No. 46-1 ¶ 83; ECF No. 32 at 201, 210.) It takes no great leap of reasoning to presume that these policies exist for the legitimate purpose of ensuring that Defendant has a regular and reliable cadre of employees to stock its grocery shelves. (*See* ECF No. 30-3 at 6.) Furthermore, Defendant presents evidence that the policies pursuant to which it terminated Plaintiff apply to all of Defendant's hourly employees, which could suggest that application of the policies in Plaintiff's case was nondiscriminatory. (ECF No. 30-3 at 9 (stating that the scope of Defendant's attendance policy extends to "[a]ll hourly store employees, hourly General Office employees and hourly Modesto Distribution Center employees").)

Finally, the evidence showing that Defendant disciplined Plaintiff for attendance-related violations in 2013 and 2014 — prior to Plaintiff sustaining the relevant injury to his knee — undercuts Plaintiff's argument that his termination was motivated solely by his disability. (*See* ECF No. 32-1 at 14–18.) This is because the only binding authority on which Plaintiff relies for his argument on this point is the Ninth Circuit's opinion in *Dark*, in which the defendant employer did not argue that the plaintiff's misconduct resulted from anything other than his disability. 451 F.3d at 1084. Here, the opposite is true because Defendant presents substantial evidence that Plaintiff repeatedly violated its attendance policy before his knee injury occurred. (*See, e.g.*, ECF No. 46-1 ¶¶ 10–13 (setting forth attendance-related points assessed to Plaintiff in 2014 for reasons unrelated to his 2015 knee injury); ECF No. 32-1 at 14–18.) Because some of the behavior for which he accumulated points that led to his termination could not possibly have flowed from the knee injury that Plaintiff contends gave rise to Defendant's discrimination

against him, Plaintiff's argument that Defendant does not proffer a truly nondiscriminatory rationale for his termination fails. (*See* ECF No. 43 at 13–14 (arguing that Plaintiff's disability arose solely from his 2015 knee injury).)

Accordingly, Defendant carries its intermediate burden of presenting legitimate and nondiscriminatory reasons for terminating Plaintiff.

*v.*     *Pretext*

Since Defendant has presented evidence that it was the cumulative effect of Plaintiff's attendance violations in 2014 and 2015 — not his knee injury — that resulted in his termination, the burden shifts back to Plaintiff to demonstrate that Defendant's rationale was pretextual. *Lucent Techs., Inc.*, 642 F.3d at 746. This may be done "either directly by persuading the court that a discriminatory reason more likely motivated the employer or indirectly by showing that the employer's proffered explanation is unworthy of credence." *Id.* (quoting *Godwin v. Hunt Wesson, Inc.*, 150 F.3d 1217, 1220 (9th Cir. 1998)). "If a plaintiff uses circumstantial evidence to satisfy this burden, such evidence 'must be specific' and 'substantial.'" *Id.* (quoting *Godwin*, 150 F.3d at 1221). This means that an employee's indirect evidence of pretext must demonstrate "such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could rationally find them unworthy of credence." *Id.* (quoting *Morgan v. Regents of the Univ. of Cal.*, 105 Cal. Rptr. 2d 652, 670 (Ct. App. 2000)). At the same time, the Ninth Circuit recognizes "that a plaintiff's burden to raise a triable issue of pretext is 'hardly an onerous one.'" *Earl v. Nielsen Media Research, Inc.*, 658 F.3d 1108, 1113 (9th Cir. 2011) (quoting *Noyes v. Kelly Servs.*, 488 F.3d 1163, 1170 (9th Cir. 2007)).

Plaintiff identifies four items of circumstantial evidence that he argues are sufficient to establish that Defendant's proffered reason for firing him was pretextual: (i) the timing of the termination decision; (ii) the inconsistency of Defendant's application of its own attendance policy to Plaintiff before and after his knee injury; (iii) the suspicious circumstances surrounding his fifth-hour rule violation on March 10, 2015; and (iv) the absence of an adequate investigation into the circumstances surrounding Plaintiff's termination. (ECF No. 43 at 18–20.)

## d. Timing

Pretext can be found where termination follows closely in time on the heels of an injury, but "temporal proximity alone is insufficient to raise a triable issue as to pretext." *Lattimore v. Euramax Int'l, Inc.*, 771 F. App'x 433, 434 (9th Cir. 2019) (citing *Arteaga v. Brink's, Inc.*, 77 Cal. Rptr. 3d 654, 675 (Ct. App. 2008)); *see also Pinder v. Emp't Dev. Dep't*, 227 F. Supp. 3d 1123, 1149 (E.D. Cal. 2017) ("For purposes of analyzing pretext, both the Ninth Circuit and California precedent permit consideration of temporal proximity where there is other evidence to support a conclusion of pretext."). Generally, where a matter of days is all that passes between an employer learning of an employee's protected status and an adverse employment action, courts find such temporal proximity to be indicative of the employer's discriminatory motive. *See, e.g.*, *Sada v. Robert F. Kennedy Med. Ctr.*, 65 Cal. Rptr. 2d 112, 124 (Ct. App. 1997) (holding that plaintiff raised a triable issue under FEHA where, *inter alia*, an adverse employment action occurred "a few days after" the employer learned that the employee submitted an administrative complaint).

Plaintiff asserts that the nine days between when he returned to work following his injury and when Defendant allegedly began discriminating against him for that injury demonstrates pretext. (ECF No. 43 at 18 ("Plaintiff was terminated just nine (9) days after returning from his medical leave.").) Defendant's primary attack on this temporal proximity evidence appears to be that it applied its attendance policy consistently both before and following Plaintiff's knee injury in early 2015, rendering the timing of Plaintiff's eventual termination for repeated violations of that policy irrelevant. (*See* ECF No. 42-1 at 20 (pointing out that "Plaintiff does not assert he was discriminated against when he incurred his previous disciplinary actions in 2014").) But outside of this collateral assertion, Defendant does not and cannot dispute that Plaintiff returned to work from medical leave status on March 1, 2015 (ECF No. 46-1 ¶¶ 70, 73; ECF No. 43-4 at 107), and was terminated on March 10, 2015 (ECF No. 46-1 ¶ 83; ECF No. 32 at 201, 210). Thus, the undisputed evidence makes it plain that only nine days elapsed between when Plaintiff returned to work following his knee-related medical leave and when he was terminated. Indeed, the evidence could support the conclusion that as little as a single day elapsed between when Plaintiff returned

to work following his knee-related medical leave (ECF No. 46-1 ¶¶ 70, 73; ECF No. 32 at 39–40), and when the alleged discrimination first manifested itself in the guise of the two disciplinary points Plaintiff received on March 2, 2015 for leaving his shift early (ECF No. 46-2 ¶¶ 48, 52; ECF No. 32 at 38–39).

Based on the foregoing, the Court concludes that Plaintiff has presented significant circumstantial evidence demonstrating close temporal proximity between when his protected status came to Defendant's attention and when he alleges Defendant began discriminating against him due to that protected status. But because temporal proximity evidence alone cannot meet Plaintiff's burden on summary judgment, Plaintiff must put forth additional specific and substantial evidence suggestive of pretext in order to meet his burden to preclude summary judgment for Defendant. *See Lattimore*, 771 F. App'x at 434 (9th Cir. 2019) (noting that other purported evidence of pretext under FEHA must be "'specific and substantial' as required to overcome [a defendant's] motion for summary judgment" (quoting *Villiarimo v. Aloha Island Air, Inc.*, 281 F.3d 1054, 1062 (9th Cir. 2002))).

e.    Application of Defendant's Attendance Policy

Evidence that an employee is subjected to disciplinary measures only after the employee's protected status becomes known or manifest to an employer can help establish pretext. *See Soria v. Univision Radio L.A., Inc.*, 210 Cal. Rptr. 3d 59, 81–82 (Ct. App. 2016) (holding that evidence employee was disciplined for her long-time issues with punctuality only after she disclosed a disability to her supervisor contributed to finding of pretext). The plaintiff in *Soria* established pretext in part by presenting evidence that though she had struggled arriving to work on time each day for the better part of a decade, she was terminated for her habitual tardiness only after she told her supervisor that she had a tumor and might need time off to have it surgically removed. *Id.* To meet his burden to demonstrate pretext, Plaintiff presents the same type of evidence, namely that though he was repeatedly allowed to leave shifts early in the past, "[i]t was only after he came back from his FMLA leave, that he was immediately disciplined for something that he has done on numerous occasions." (ECF No. 43 at 19.)

Specifically, Plaintiff contends he left his shift early without repercussion on at least eight

30

separate instances in November and December of 2014, as well as on January 13, 2015.  (ECF No. 43 at 19; *see also* ECF No. 43-3 ¶ 20 ("There have been numerous occasions where I have left work early without being disciplined for doing so.").)  Plaintiff contrasts this with how he was treated on March 2, 2015, when he was assessed two disciplinary points for leaving his shift early after he had returned from his knee-related medical leave.  (ECF No. 46-2 ¶ 52; ECF No. 32 at 38–39.)  According to Defendant, this evidence does not show what Plaintiff says because "there is a difference between Plaintiff's shift ending early (where he correctly would not be disciplined), and Plaintiff working an incomplete shift, i.e., when he left before his shift ended."  (ECF No. 46 at 6.)  Defendant argues that it consistently applied its attendance policy to Plaintiff because it assessed him points for "every unprotected incomplete shift" and did not assess him points when Plaintiff's shift simply ended early.  (ECF No. 46 at 6.)

Defendant's argument is unconvincing for two reasons.  First, the evidence reveals a genuine dispute of fact regarding whether Plaintiff's shift on March 2, 2015, did actually conclude early, or whether Plaintiff left before his shift ended.  Plaintiff testified that after he informed a supervisor that he had to leave work on March 2 in order to attend a physical therapy appointment, his supervisor did not tell him that doing so would constitute an unexcused absence and actually gave Plaintiff permission to go.  (ECF No. 43-6 at 61, 77–78.)  Plaintiff testified that he would not have left work early on March 2 had he known that doing so would subject him to discipline, as actually occurred the following Wednesday when Plaintiff skipped a physical therapy appointment after his supervisor informed him that leaving early to attend the appointment would constitute an incomplete shift.  (ECF No. 43-6 at 61.)  On these facts viewed most favorably to Plaintiff, a reasonable jury could conclude that Plaintiff's supervisor gave him at least tacit — if not explicit — approval to leave his shift early on March 2, and that this supervisorial approval meant that Plaintiff's March 2 shift had ended early and would not be categorized as incomplete.  (*See* ECF No. 43-6 at 79 (containing Plaintiff's testimony that he believed his shift had concluded when he left work on March 2).)  Such a conclusion by a factfinder would validate Plaintiff's theory of pretext, because it would suggest that it was only after Plaintiff returned from his knee-related medical leave that he began receiving discipline for

doing what he had permissibly done in the past and what his supervisor gave him permission to do in that specific instance. *See Soria*, 210 Cal. Rptr. 3d at 81 ("Viewing the evidence most favorably to Soria, as we must, it was not until Soria disclosed her disability to her supervisor that her tardiness became a problem.").

Second, the evidence viewed in a light most favorable to Plaintiff does not support Defendant's contention that "Plaintiff was allotted points for every unprotected incomplete shift that he worked and he was not allotted any points for those days where his work shift simply ended early." (ECF No. 46 at 6.) Plaintiff's November 2014 shifts offer an illustrative example because Plaintiff contends that he left work early on five dates that month without repercussion. (ECF No. 43 at 19.) The evidence confirms that Plaintiff left his shifts before their scheduled conclusions on those dates. (ECF No. 43-4 at 100–03.) Defendant cites to Plaintiff's work schedule and time clock records for November 2014 (*see* ECF No. 30-3 ¶ 8; ECF No. 30-3 at 51–53, 79–82), to show that all of these shifts "simply ended early" and so were not incomplete (ECF No. 46 at 6). But there is nothing in this evidence that would allow the Court to make such a conclusion, because Plaintiff's schedule and time clock records do not reveal why Plaintiff left work before the scheduled ends of these shifts. Raw printouts from Defendant's employee records database say nothing about whether Plaintiff received supervisorial permission on any of the dates he departed work early (*see* ECF No. 43-6 at 77–78), nor do they say anything that would allow a factfinder to draw a reasoned distinction between Plaintiff's early departures in November 2014, and his early departure on March 2, 2015 (*see* ECF No. 43 at 19; ECF No. 46 at 6).

Defendant responds that throughout Plaintiff's employment, it scrupulously distinguished between shifts that ended early and shifts which Plaintiff left early without permission, and as evidence of this points to three instances prior to Plaintiff's knee injury when he was disciplined for an incomplete shift. (*See* ECF No. 46 at 6.) But the actual evidence Defendant cites to support its argument on this point is less than convincing. The Court is unable to locate any references to Plaintiff's incomplete shifts in April and June of 2013 in Exhibit B to the declaration attributed to Margarita Garcia. (*See* ECF No. 46 at 6 (citing to "Garcia Decl., Exh. B"

to support the proposition that Plaintiff "had incomplete shifts on all of the following days and received two points, pursuant to WinCo's Attendance Policy: (1) April 18, 2013 Incomplete Shift, 2 Points; (2) June 15, 2013, Incomplete Shift, 2 Points").)  And the only thing shown by the references to these incomplete shifts in Exhibit E to the declaration attributed to Christopher Wimpfheimer is that Plaintiff was in fact assessed two attendance-related points for each instance.  (*See* ECF No. 42-1 at 12 (citing to "Wimpfheimer Decl., Exh C [sic]" to show that Plaintiff "also had incomplete shifts on 4/18/13 and 6/15/13"); ECF No. 30-3 at 89.)  Because nothing in Defendant's evidence speaks to any of the underlying circumstances that gave rise to Plaintiff's discipline for his incomplete shifts on April 18 and June 15, 2013, the Court can find no basis to distinguish between instances when Plaintiff was disciplined for leaving before the end of his scheduled shift and instances when he was not.  (*See* ECF No. 43-3 ¶ 20.)

As far as Plaintiff's incomplete shift that began on June 3, 2014, the evidence regarding that shift is murky as well.  This is because it consists primarily of attendance record database printouts and a virtually illegible employee attendance form.  (*See* ECF No. 32-1 at 15, 128; ECF No. 32 at 193.)  Like the evidence regarding Plaintiff's other incomplete shifts analyzed above, these records demonstrate very little about whether Plaintiff received supervisorial permission to leave his shift early that day (*see* ECF No. 43-6 at 77–78), and they do not reveal any other basis that would allow a factfinder to draw a reasoned comparison between Plaintiff's early departure on June 3, 2014, and his early departures following his knee injury in 2015 (*see* ECF No. 43 at 19; ECF No. 46 at 6).  They certainly do not provide strong corroborating evidence of Defendant's claim that Plaintiff's incomplete shift beginning on June 3, 2014, resulted in two attendance-related points solely because "he worked only 1095 hours in the last 12 months." (ECF No. 42-1 at 12.)[2]

It is true, as Defendant strenuously argues, that Plaintiff has relatively little independent

---

[2]     Defendant's explanation for assessing Plaintiff two attendance-related points for his incomplete shift that began on June 3, 2014 is that "FMLA was denied by Unum."  (ECF No. 46-1 ¶ 56.)  While that may be true, Defendant's actual evidence again says little about why Unum rejected Plaintiff's request for FMLA coverage on that date.  (*See* ECF No. 32-1 at 15 ("Per Unum – shc claim denied."), 116 ("If you are eligible for leave and have time available, you will receive separate communication about the status of your leave(s) from our Leave Management Center.").)

evidence that he actually had a March 2, 2015, physical therapy appointment at all. (*See* ECF No. 46 at 5 ("Plaintiff admits that no evidence of his alleged physical therapy visit on March 2, 2015, exists, nor could he recall the name of the physical therapist or office location where he received such therapy.").) But this does not mean that there is no genuine dispute of fact about whether Plaintiff's early departure from work on that day was handled so differently by Defendant, compared to similar instances prior to his knee injury, such that it could give rise to a reasonable inference of pretext. *See Lucent Techs., Inc.*, 642 F.3d at 746 (noting that a plaintiff's burden at summary judgment is to present evidence undermining the "employer's proffered legitimate reasons for its action [such] that a reasonable factfinder could rationally find them unworthy of credence"). Much the same is true of Defendant's argument that it was not discriminatory for Plaintiff to be assessed two attendance points for his March 2, 2015, shift since he did not submit a physician's note corroborating his physical therapy appointment on that day. (*See* ECF No. 46 at 5.) This is because a close examination of the evidence submitted by Defendant suggests that Plaintiff was assessed two attendance-related points in Defendant's employee record-keeping system roughly four hours after he left his shift on March 2, 2015. (*See* ECF No. 32 at 206 (reflecting that Plaintiff's employee record was assessed two attendance-related points for his March 2, 2015, incomplete shift shortly after 11:00 a.m. that same day).) Though there is quite possibly an innocuous reason for the quickness with which Defendant disciplined Plaintiff for not having a physician's note to corroborate his early-morning physical therapy appointment, a reasonable jury might nevertheless conclude that this evidence shows how eager Defendant was to convert Plaintiff's need to treat his knee injury into points that would later contribute to his termination. (*See* ECF No. 43-6 at 114 (suggesting that employee absences are entered into Defendant's recordkeeping system first and, if subsequently determined to be FMLA-protected, no points are assessed to the employee). Accordingly, Plaintiff's statement in his declaration that he frequently left work early without repercussion before his knee injury reasserted itself in early 2015, combined with the evidence explored above and the requirement that the Court view the evidence in the light most favorable to Plaintiff at this stage of the litigation, is enough to create a genuine dispute of fact that merits resolution by a jury. *See Nigro*, 748 F.3d at 499 (holding that

it is "entirely beside the point that some of [the plaintiff]'s evidence was self-serving, as it will often be the case in a discrimination case that an employee has something to say about what company representatives said to him or her," and because "the weight [of such evidence] is to be assessed by the trier of fact at trial, not to be the basis to disregard the evidence at the summary judgment stage").

Hence, the most that Defendant's shift-related evidence establishes — when viewed in the light most favorable to Plaintiff — is that Defendant may have been inconsistent in applying its own rules that distinguish between incomplete shifts and shifts that merely end early. It does not show that Plaintiff was disciplined without exception every time he worked an incomplete shift. Defendant thus fails to rebut the evidence supplied by Plaintiff's declaration that he routinely left work early without discipline prior to his knee problems in 2015. (ECF No. 43-3 ¶¶ 20, 53; ECF No. 43-4 at 100–04); *see also Nigro*, 784 F.3d at 497 (holding that a self-serving declaration is not inadmissible solely because it is self-serving, and that a district court should not disregard the evidence from a self-serving declaration unless it "states only conclusions and not facts that would be admissible evidence"). And it is this evidence which suggests that Defendant's proffered rationale for his termination is pretextual, because it shows that Defendant tended to treat Plaintiff's early-concluding shifts more leniently prior to his knee problems in 2015. (*See* ECF No. 43-3 ¶¶ 20, 53; ECF No. 43-4 at 100–04); *Soria*, 210 Cal. Rptr. 3d at 81–82.

### f.      Fifth-Hour Rule Violation on March 10, 2015

A plaintiff may demonstrate pretext "by showing that the employer's proffered explanation is unworthy of credence," which, in turn, may generally be accomplished by highlighting "weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action." *Lucent Techs., Inc.*, 642 F.3d at 746 (quoting *Godwin*, 150 F.3d at 1220; *Morgan*, 105 Cal. Rptr. 2d at 670). Such evidence may take many forms. For example, in *Dark*, the Ninth Circuit found evidence of pretext in, *inter alia*, the plaintiff's medical examination, statements in a letter that placed the plaintiff on administrative leave, contradictions in a letter sent to the plaintiff that actually terminated his employment, and comparative evidence of how the plaintiff was treated before and after his employer learned that

he suffered from seizures. 451 F.3d at 1083, 1085–86; *see also Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 147 (2000) ("Proof that the defendant's explanation is unworthy of credence is simply one form of circumstantial evidence that is probative of intentional discrimination . . . .").

Plaintiff argues that the facts leading up to his fifth-hour rule violation on March 10, 2015, show that Defendant's rationale for terminating him was pretextual — in effect, that Plaintiff's fifth-hour rule violation was the culmination of a setup designed to trap him in a technical violation of Defendant's break policies. (ECF No. 43 at 19.) Specifically, Plaintiff points out that on March 10, 2015, he was visibly limping and told his supervisor, Heide, that he was in pain. (ECF No. 43 at 19.) Yet Heide ordered Plaintiff to fill the store's cart room at 4:00 in the morning. (ECF No. 43 at 19.) Not only did this happen to be when Plaintiff normally took his lunch break so that he could comply with Defendant's five-hour rule, but Plaintiff also contends that Heide in this instance did not follow Defendant's general practice "to ascertain whether an employee had taken his lunch break" before issuing that employee an order that was likely to result in a five-hour rule violation. (ECF No. 43 at 19.) Plaintiff also contends that this was the first time in his career that he had been asked to fill a cart room at that time. (ECF No. 43 at 19.) And Plaintiff points to Defendant's failure to investigate why he was unable to comply with Heide's unreasonable cart room task as further evidence that Defendant effectively manufactured the cart room assignment as a way to force Plaintiff to choose between two courses of action that would both result in his termination: either defy a supervisor's order or else violate Defendant's five-hour rule. (ECF No. 43 at 19.)

Defendant asserts that none of what occurred on March 10, 2015, demonstrates discriminatory animus. Defendant points out that Plaintiff failed to tell Heide he may not be able to take his lunch break in time if he was forced to fill the cart room alone. (ECF No. 42-1 at 16 n.4.) Defendant also argues that it cannot be at fault for Plaintiff's failure to take his lunch break in a timely fashion since he could have taken that break any time after his second hour of work. (ECF No. 42-1 at 16 n.3; ECF No. 46 at 5.) And Defendant contends that just because Plaintiff had never seen any of his colleagues be tasked with collecting carts alone does not mean "that no

other freight stocker was ever asked to collect carts by themselves at that time." (ECF No. 42-1 at 16; *see also* ECF No. 46 at 4–5.)

Once again, Defendant fails to convince the Court that Plaintiff's evidence from the March 10, 2015, incident is anything less than circumstantial evidence of pretext. Plaintiff not only testified that he typically took his lunch at 4:30 a.m. (ECF No. 32 at 25), but there is evidence in the record suggesting that Heide, as a supervisor, was partially responsible for ensuring that a supervisee like Plaintiff did not violate Defendant's five-hour rule (ECF No. 43-6 at 126). Plaintiff also testified that he had never before been asked to fill the cart room between 4:00 a.m. and 5:00 a.m. prior to Heide's instruction that he do so on March 10, 2015. (ECF No. 43-6 at 83.) And Plaintiff testified that the task of filling the cart room was normally performed by multiple employees at once, but on March 10 he was instructed to complete this task on his own. (ECF No. 43-6 at 65, 83.) Finally, the evidence reveals that the fifth-hour rule violation for which Defendant terminated Plaintiff resulted from a particularly technical — a reasonable factfinder might even characterize it as nit-picky — application of Defendant's break policies. (*See* ECF No. 43-6 at 102; ECF No. 32 at 91 (demonstrating that the misconduct giving rise to Plaintiff's fifth-hour rule violation was that he clocked out a mere two minutes past the deadline).) Defendant presents no compelling reason why the Court should disbelieve or disregard these components of Plaintiff's evidentiary showing, all of which suggest that Defendant may have had an ulterior motive when Heide ordered Plaintiff to collect hundreds of shopping carts at 4:00 a.m. on March 10, 2015.

Indeed, Plaintiff's evidence must be considered within the context that (i) Plaintiff was openly and clearly suffering from a painful knee injury (*see* ECF No. 43-3 ¶¶ 16–17; ECF No. 43-6 at 91–92, 94–95, 101–02), (ii) this was the first time Plaintiff had ever witnessed an employee be instructed to collect shopping carts alone at this time of night (*see* ECF No. 43-6 at 103), and (iii) Plaintiff had noticed that his supervisors were behaving differently toward him since his knee injury manifested itself in 2015 (ECF No. 43-6 at 65–66, 95). Taking all these facts together as one picture, a reasonable jury could conclude that Heide deliberately ordered Plaintiff to perform a difficult physical task for the first time and within a challenging time frame

in order to manufacture either a fifth-hour rule violation or insubordination on Plaintiff's part. (*See* ECF No. 43-6 at 84–85.) Since there is evidence that either of these outcomes would have served as cause for Plaintiff's termination (ECF No. 43-6 at 89, 118), and since one of Defendant's justifications for Plaintiff's termination was his fifth-hour rule violation (*see* ECF No. 46-1 ¶ 38; ECF No. 46-2 ¶ 70), the Court finds that Plaintiff has produced a number of items of circumstantial evidence suggesting there are enough weaknesses and implausibilities "in the employer's proffered legitimate reasons for its action that a reasonable factfinder could rationally find them unworthy of credence." *Lucent Techs., Inc.*, 642 F.3d at 746 (quoting *Godwin*, 150 F.3d at 1220; *Morgan*, 105 Cal. Rptr. 2d at 670).

Little that Defendant argues to the contrary is convincing. As one example, Defendant asserts that the evidence reveals that Plaintiff himself "had never ***seen*** anybody sent out alone at that time" to collect shopping carts as he was on March 10, 2015. (ECF No. 42-1 at 16.) The implication is that since Plaintiff cannot and did not testify that he is certain no other freight stocker was ever asked to do what Plaintiff was asked to do at 4:00 a.m. on March 10, the Court should somehow disregard those aspects of Plaintiff's testimony that are based on his own personal experience. (*See, e.g.*, ECF No. 32 at 92–94, 95–96.) Defendant presents no principled reason why the Court should do so, particularly since Defendant points to no affirmative evidence from any other source to suggest that freight stockers were regularly dispatched to collect shopping carts around 4:00 a.m. (*See* ECF No. 42-1 at 16.) The only evidence the Court can find in the record speaking to Defendant's regular practice regarding cart collection is Plaintiff's deposition testimony which — because it is based on his percipient knowledge developed over multiple years of working for Defendant — is compelling. (*See* ECF No. 32 at 92 ("In my five years of working there, I had never seen them send anybody out at that particular time by themselves to do carts.").)

As another example, Defendant argues that Plaintiff's failure to clock out for his lunch break on March 10, 2015 cannot be evidence of discriminatory intent on Defendant's part because "Plaintiff could have taken his lunch break between his second and fifth hour of work" (ECF No. 42-1 at 16 n.3), and because "Plaintiff also admitted that he didn't tell Heide he was concerned he

wouldn't finish the job in 35 minutes before his lunch break" (ECF No. 42-1 at 16 n.4). The Court sees no reason to doubt these facts, but that does not mean they automatically wipe away Plaintiff's contrary evidence suggesting that in his role as a supervising clerk, Heide would or should have known that Plaintiff was nearing his mandatory lunch break (*see* ECF No. 43-6 at 126 (containing testimony from supervisor Steven Lagos that "if one of my employees were coming up to their fifth hour, then they know and I know to direct them to lunch")), that Plaintiff regularly took his lunch break around 4:00 a.m. (*see, e.g.*, ECF No. 43-4 at 105–08 (revealing that Plaintiff clocked out around 4:00 a.m. nearly every day that he worked between January and March of 2015)), and that supervisors typically did not ask their supervisees to perform tasks that would impinge on said breaks (ECF No. 43-6 at 126). A reasonable factfinder faced with this competing evidence might credit Defendant's theory that it was Plaintiff's duty to inform Heide that he was approaching his fifth straight hour of work when he was asked to fill the cart room, or it might credit Plaintiff's theory that Heide waited to ask Plaintiff to fill the cart room until he knew that Plaintiff would be unable to do so without committing a fifth-hour rule violation. The point is that the factfinder for such a determination, as for many of the material factual determinations in this case that can only be made after weighing the evidence and judging credibility, must be a jury after a trial and not the Court on summary judgment. *See Anderson*, 477 U.S. at 255 ("Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge . . . .").

g.      Lack of Investigation of Plaintiff's Fifth-Hour Rule
Violation

Finally, Plaintiff argues that the lack of an "investigation as to why Mr. Fulfer was unable to stack the carts as fast as Mr. Heide wanted him to" demonstrates pretext. (ECF No. 43 at 19; ECF No. 32 at 151.) Though not entirely clear from Plaintiff's opposition papers, the implication appears to be that had Defendant not been eager to create a pretextual rationale for terminating Plaintiff, it would have investigated the circumstances behind his fifth-hour rule violation on March 10, 2015, to ensure that they merited his termination.

The only evidence Defendant presents regarding the lack of any investigation on its part

before deciding to terminate Plaintiff is that he admitted that he was, in fact, "late clocking out for lunch on March 10, 2015." (ECF No. 46-2 ¶ 74.) The Court interprets this to mean that Defendant is essentially arguing that an investigation of the circumstances justifying Plaintiff's termination was unnecessary, because he had committed a technical violation of Defendant's fifth-hour rule and this alone justified his termination. (*See* ECF No. 32 at 151 (containing testimony from Lagos that he did not believe it was "important to perform an investigation as to why [Plaintiff] failed to clock out" before terminating Plaintiff).)

Plaintiff's evidence regarding the lack of an investigation is a limited (at best) indicator that Defendant's explanation for terminating him was pretextual. That being said, the Court nonetheless finds that Plaintiff's showing is effectively unrebutted because Defendant presents no explanation for why it did not ask any questions before terminating Plaintiff over a two-minute violation of the fifth-hour rule. (*See* ECF No. 46-2 ¶ 74.) Accordingly, Plaintiff's evidence that there was no investigation before he was terminated lends at least some support to his overall evidentiary showing that suggests Defendant's true motivation for terminating him was not actually his fifth-hour rule violation on March 10, 2015. *See Lucent Techs., Inc.*, 642 F.3d at 746 (requiring a plaintiff's evidence to show weaknesses "in the employer's proffered legitimate reasons for its action [such] that a reasonable factfinder could rationally find them unworthy of credence" (quoting *Godwin*, 150 F.3d at 1220; *Morgan*, 105 Cal. Rptr. 2d at 670)).

### vi.    *Conclusion re FEHA Discrimination Claim*

For the foregoing reasons, Defendant is not entitled to summary judgment on Plaintiff's claim of unlawful discrimination brought pursuant to FEHA.

### C.    Failure to Accommodate in Violation of FEHA

Defendant moves the Court to grant summary judgment in its favor on Plaintiff's claim for failure to accommodate. Defendant bases its motion on two alternative grounds: (i) failure to exhaust administrative remedies and (ii) failure to establish a *prima facie* case of failure to accommodate, because Defendant at all times accommodated Plaintiff. (ECF No. 42-1 at 20–21.)

### i.    *Administrative Exhaustion*

Defendant argues that Plaintiff failed to exhaust his administrative remedies as to his

1 failure-to-accommodate cause of action.  (ECF No. 42-1 at 20.)

2    Specifically, Defendant argues that Plaintiff is barred from bringing this claim because

3 "Plaintiff failed to assert any factual allegations regarding one of two accommodations Plaintiff

4 now claims he did not receive (i.e., becoming a cashier)" when Plaintiff filed his administrative

5 discrimination claim before the DFEH.  (ECF No. 42-1 at 20.)  Plaintiff responds by arguing that

6 the underlying purpose of the administrative exhaustion requirement is merely to provide a basis

7 for the DFEH to investigate the employee's claims and is not intended to limit what causes of

8 action a plaintiff may eventually include in a full-fledged lawsuit.  (ECF No. 43 at 24.)  Plaintiff

9 also asserts that the DFEH complaint he did file satisfied the administrative exhaustion

10 requirement because its allegations of failure to accommodate, "coupled with the complaint on

11 file and the extensive discovery that was completed in this case through depositions, certainly

12 gave Defendant's [sic] notice of Plaintiff's basis for his allegations."  (ECF No. 43 at 24.)

13    "In order to bring a civil action under FEHA, the aggrieved person must exhaust the

14 administrative remedies provided by law."  *Rodriguez v. Airborne Express*, 265 F.3d 890, 896

15 (9th Cir. 2001) (quoting *Yurick v. Superior Court*, 257 Cal. Rptr. 665, 667 (Ct. App. 1989)).

16 "Exhaustion in this context requires filing a written charge with DFEH within one year of the

17 alleged unlawful employment discrimination, and obtaining notice from DFEH of the right to

18 sue."  *Id.* (citing *Romano v. Rockwell Int'l, Inc.*, 926 P.2d 1114, 1121 (Cal. 1996); *Okoli v.*

19 *Lockheed Technical Operations Co.*, 43 Cal. Rptr. 2d 57, 61 (Ct. App. 1995); *Martin v. Lockheed*

20 *Missiles & Space Co.*, 35 Cal. Rptr. 2d 181, 183 (Ct. App. 1994)).  "Allegations in the civil

21 complaint that fall outside of the scope of the administrative charge are barred for failure to

22 exhaust."  *Id.*  Generally, allegations in a civil complaint are within the scope of an administrative

23 charge where they are "'like or reasonably related to' the allegations made in the charge of

24 discrimination," *Couveau v. Am. Airlines, Inc.*, 218 F.3d 1078, 1082 (9th Cir. 2000) (per curiam)

25 (citing *Okoli*, 43 Cal. Rptr. 2d at 61)), or where they are "likely to be uncovered in the course of a

26 DFEH investigation," *Okoli*, 43 Cal. Rptr. 2d at 63.  Courts are to construe these administrative

27 exhaustion requirements liberally so as to accomplish FEHA's purposes, which clearly include

28 eliminating discrimination in employment.  *Rodriguez*, 265 F.3d at 896 (citing Cal. Gov't Code

§§ 12993(a), 12920).

Here, Plaintiff's administrative complaint "allege[d] that [Defendant] took the following adverse actions against [Plaintiff]: Discrimination, Harassment, Retaliation[,] Denied a good faith interactive process, . . . Denied reasonable accommodation." (ECF No. 43-6 at 6.)  It further alleged that Defendant and its employees took numerous actions that could reasonably be interpreted as failing to accommodate Plaintiff's request for modified duty.  For instance, Plaintiff's DFEH complaint alleged that he presented Defendant's secretary with a physician's note requesting light or modified duty, that Defendant's refusal to accommodate this request forced Plaintiff to return to his physician for a subsequent note taking Plaintiff off work entirely for a week, and that "[n]obody at the company engaged in any communications with Plaintiff as to accommodations that are available to Plaintiff." (ECF No. 43-6 at 7.)  Plaintiff's DFEH complaint further alleged that "Plaintiff was specifically told that because his injury took place outside of work, he was not to be accommodated at work and he was to perform his regular duties." (ECF No. 43-6 at 7.)

It is clear to the Court that the DFEH complaint's allegations were more than sufficient to serve as a preview that specific instances of Defendant's alleged non-accommodation were "likely to be uncovered" in the course of investigating that claim.  *Okoli*, 43 Cal. Rptr. 2d at 63. The facts in Plaintiff's DFEH complaint describe a situation in which Defendant could and should have done more to accommodate him by engaging in communications with Plaintiff and by granting his request for accommodation even though the injury he needed to have accommodated did not occur at work.  (ECF No. 43-6 at 7.)  Furthermore, Plaintiff's DFEH complaint specifically stated that he believed he was "[d]enied reasonable accommodation." (ECF No. 43-6 at 6.)  Defendant presents no authority for the proposition that a charge in a DFEH complaint only exhausts administrative requirements where it sets out all pertinent factual details supporting said charge.  (*See* ECF No. 42-1 at 20–21.)[3]  But that is effectively the interpretation of the law that

---

[3] The only case cited by Defendant in support of its exhaustion argument is not to the contrary because in that case, the claims found to be barred for failure to exhaust administrative remedies were entirely new theories of discrimination never presented to DFEH prior to the claimant filing suit.  *Martin*, 35 Cal. Rptr. 2d at 183 (describing an administrative history in which the claimant attempted to sue based on "theories of sexual discrimination, harassment and retaliation" that were never formally presented to DFEH).  Here, DFEH received notice of Plaintiff's

Defendant would have the Court adopt under these circumstances, where Plaintiff's administrative allegations clearly contemplate a failure-to-accommodate claim but simply do not set out exactly what type of accommodation — retraining as a cashier — was allegedly denied him. *See Couveau*, 218 F.3d at 1082 ("An FEHA complaint . . . may encompass any discrimination that is 'like or reasonably related to' the allegations made in the charge of discrimination." (citing *Okoli*, 43 Cal. Rptr. 2d at 61)).

Consequently, Defendant is not entitled to summary judgment on Plaintiff's failure-to-accommodate theory on the basis that Plaintiff failed to satisfy administrative exhaustion requirements.

*///*

### ii.     Prima Facie *Case of Failure to Accommodate*

Defendant alternatively moves for summary judgment on the merits of Plaintiff's failure-to-accommodate claim on the basis that he failed to provide the necessary and required medical documentation that would have allowed Defendant to actually accommodate him. (ECF No. 42-1 at 21–22.) According to Defendant, simply providing a physician's note requesting the vague accommodation of being placed on "modified duty" did not give Defendant enough information to decide whether and how to accommodate Plaintiff following his knee problems in 2015. (ECF No. 42-1 at 21–22.) And regarding Plaintiff's request that he be accommodated by being trained to work as a cashier, Defendant argues that this particular failure-to-accommodate claim is meritless because he did not submit the required paperwork to become a cashier or apply to be a cashier via Defendant's internal job portal. (ECF No. 42-1 at 22.)

Plaintiff argues that his paperwork shortcomings were not shortcomings at all, and certainly do not mean that Defendant was absolved of its duty to afford him reasonable accommodation. Specifically, Plaintiff asserts that Defendant was put on notice of Plaintiff's need for accommodation via the documentation from his physician that he did provide to

---

failure-to-accommodate theory under FEHA, even if it arguably did not receive notice of the particulars of the alleged failure by Defendant to accommodate Plaintiff's disability. (*See* ECF No. 43-6 at 6 (alleging that Defendant "took the following adverse actions against [Plaintiff]: Discrimination, Harassment, . . . Denied reasonable accommodation").)

Defendant.  (ECF No. 43 at 22 (pointing out that "Plaintiff requested to be placed on modified duties on January 22, 2015 and provided a note from his physician stating the same").)  Plaintiff also asserts that he verbally informed his supervisors that he wished to be trained to become a cashier to take pressure off his legs, and highlights that Defendant made no effort to assist him in filling out the required paperwork to lodge such an accommodation request.  (ECF No. 43 at 22.) Plaintiff argues that at that point, Defendant had an affirmative obligation to engage in an interactive process with him to find an accommodation that would help him work even while injured.  (ECF No. 43 at 20.)  Since Defendant did not do so and since open positions would have accommodated Plaintiff's injury, he argues that genuine issues of material fact exist as to whether he was properly accommodated.  (ECF No. 43 at 21–22.)

"The elements of a failure to accommodate claim are: '(1) the plaintiff has a disability under the FEHA, (2) the plaintiff is qualified to perform the essential functions of the position, and (3) the employer failed to reasonably accommodate the plaintiff's disability.'"  *Nigro*, 784 F.3d at 498 (quoting *Scotch v. Art Inst. of Cal.-Orange Cty., Inc.*, 93 Cal. Rptr. 3d 338, 358 (Ct. App. 2009)).  Furthermore,

> [a]n "employer cannot prevail on summary judgment on a claim of failure to reasonably accommodate unless it establishes through undisputed facts" that "reasonable accommodation was offered and refused," that "there simply was no vacant position within the employer's organization for which the disabled employee was qualified and which the disabled employee was capable of performing with or without accommodation," or that "the employer did everything in its power to find a reasonable accommodation, but the informal interactive process broke down because the employee failed to engage in discussions in good faith."

*Lucent Techs., Inc.*, 642 F.3d at 743 (quoting *Jensen v. Wells Fargo Bank*, 102 Cal. Rptr. 2d 55, 68 (Ct. App. 2000)).  As the above authority demonstrates, California's employment law requires a court ruling on summary judgment in a failure-to-accommodate case to examine whether there is a genuine dispute of material fact regarding "whether the informal process broke down, and, if so, which party was responsible."  *Jensen*, 102 Cal. Rptr. 2d at 68.

///

///

The main thrust of Defendant's position is that it is Plaintiff's fault he was not accommodated in January of 2015.  (*See* ECF No. 42-1 at 22.)  Stated another way, Defendant argues that the undisputed facts demonstrate that though it "did everything in its power to find a reasonable accommodation [for Plaintiff's knee injury]," his refusal to provide a physician's note specifying what specific modified duties he was requesting meant that "the informal interactive process broke down because [Plaintiff] failed to engage in discussions in good faith."  *Lucent Techs., Inc.*, 642 F.3d at 743 (quoting *Jensen*, 102 Cal. Rptr. 2d at 68).

It is true that substantial evidence exists that Defendant did not receive the medical documentation it said it needed in order to explore reasonable accommodations for Plaintiff's knee injury in January 2015.  (*See* ECF No. 46-1 ¶ 61; ECF No. 32 at 144–46 (setting forth Defendant's rationale for requiring a physician's note before approving a workplace accommodation predicated on physical disability); ECF No. 32-1 at 6 (setting forth Plaintiff's responsibilities when requesting an accommodation, which included "provid[ing] necessary and appropriate medical documentation").)  That being said, there nonetheless remains a genuine dispute of fact regarding "which party was responsible" for this breakdown of paperwork exchange.  *Jensen*, 102 Cal. Rptr. 2d at 68.  Via Amaral, Plaintiff provided Defendant a physician's note stating that he needed to be on modified duty for a matter of days, then followed up by filling out a Reasonable Workplace Accommodation Form that set forth in greater detail what specific accommodations Plaintiff was requesting.  (ECF No. 46-1 ¶ 60; ECF No. 43-3 ¶ 8; ECF No. 43-4 at 42; ECF No. 43-6 at 49–50.)  On these facts alone, a reasonable jury could find that Plaintiff discharged his responsibilities under the plain terms of Defendant's Workplace Accommodation Policy.  (*See* ECF No. 32-1 at 7 ("Employees may request a reasonable workplace accommodation through various means, including in person, in writing, or by providing a physician's note that denotes that the employee has a need for accommodation.").)

But critically, Plaintiff testified more than once during his deposition that after he submitted this first round of paperwork to Amaral, he never received any communication from her or from any of Defendant's other agents requesting a more specific physician's note than what

Plaintiff provided on January 22, 2015.  (ECF No. 46-2 ¶¶ 28–29; ECF No. 43-6 at 50.)

Defendant does not present any evidence directly refuting this point, instead relying repeatedly on

its assertion that Plaintiff did not ask his physician to specify what sorts of modified duties

Plaintiff was cleared to perform.  (*See, e.g.*, ECF No. 46-1 ¶ 61; ECF No. 46-2 ¶ 29.)  A

reasonable jury presented with this evidence could conclude that it was Defendant that failed to

engage in good faith in the interactive process of finding a suitable workplace accommodation for

Plaintiff.  Unlike the situation in *Jensen* which Defendant cites, there is little to no evidence here

that Plaintiff rejected alternative positions offered to him, *see Jensen*, 102 Cal. Rptr. 2d at 68, nor

that he demanded an unreasonably specific or unique accommodation, *see id.* at 69–70 (finding a

genuine dispute of fact regarding blame for breakdown in the interactive process even where

evidence existed that the employee identified no less than eight criteria that her requested

reasonable accommodation needed to meet).

Furthermore, even assuming that Plaintiff had been informed that he merely needed to

submit more definitive paperwork in order to move his accommodation request along, the

evidence suggests that Defendant's response to his initial request shut down any potential for a

reasonable accommodation before Plaintiff could produce a supplemental note from Dr. Modi.

(*See* ECF No. 43-6 at 50 (testifying that "as soon as [Amaral] saw [Plaintiff's first January 22,

2015, physician's note requesting modified duty], she said we can't do modified duty unless it

was an on-the-job injury").)  It cannot be said that Plaintiff "failed to engage in discussions in

good faith" where the evidence suggests that Plaintiff's original request for accommodation was

met with a relatively conclusive and speedy rejection.  *Lucent Techs., Inc.*, 642 F.3d at 743

(quoting *Jensen*, 102 Cal. Rptr. 2d at 68).  Such a holding would turn the law of reasonable

accommodation in the Ninth Circuit — which places the burden on the employer at summary

judgment to show that the employee sabotaged the employer's efforts to accommodate a

disability — on its head.  *See id.*

b.    Requested Accommodation of Cashier Training

Defendant argues that Plaintiff "entirely failed to follow up or apply for" his requested

accommodation of being retrained to become a cashier.  (ECF No. 42-1 at 22.)  Plaintiff responds

that he did request to become a cashier on March 1, 2015, but that his supervisors denied that request and told him to be a more efficient freight clerk before they would consider such an accommodation. (ECF No. 43 at 22.) There are at least two reasons why Defendant's argument fails, both of which demonstrate that there is a disputed issue of fact regarding whether Defendant "did everything in its power to find a reasonable accommodation" in response to Plaintiff's cashier request. *Lucent Techs., Inc.*, 642 F.3d at 743 (quoting *Jensen*, 102 Cal. Rptr. 2d at 68).

First, Defendant's reliance on Plaintiff's failure to submit the proper paperwork in support of his request to be a cashier is rebutted by the fact that Defendant's own workplace accommodation policy states that "[e]mployees can submit a request for a reasonable accommodation through various means, including in person, in writing, or by providing a physician's note." (ECF No. 32-1 at 7.) Plaintiff's evidence demonstrates that he chose the first of these alternatives by telling his supervisors on March 1, 2015, that he was requesting the accommodation of being retrained to become a cashier. (ECF No. 43-3 ¶ 17; ECF No. 43-6 at 98–99.)[4] Defendant presents no evidence to the Court suggesting that any of the supervisors to whom Plaintiff spoke regarding cashier training attempted to engage with him in good faith, or even that they informed Plaintiff that he would need to submit certain documentation or officially apply for the position before he would be accommodated. (*See* ECF No. 46-2 ¶ 48 (responding to Plaintiff's evidence that he verbally requested reassignment to a cashier position on March 1, 2015, only that "Plaintiff admitted that he never submitted a request for accommodation form with regard to becoming a cashier, nor did he ever apply to become a cashier on WinCo's internal job portal"); ECF No. 43-3 ¶ 21.) Indeed, the record contains evidence suggesting that Plaintiff's supervisors pressured him to increase his efficiency as a freight clerk before he would be considered for the cashier position he requested in 2015. (*See* ECF No. 43-6 at 92–93, 98–99.) Since Plaintiff's knee injury made it physically painful for him to perform his duties as a freight clerk (*see* ECF No. 43-3 ¶ 17), a reasonable jury could find that Plaintiff's supervisors' responses

---

[4] The Court notes that paragraph 17 of the declaration submitted by Plaintiff states that on March 1, 2017, he informed his supervisors that he intended to apply for FMLA leave for any work hours his knee injury forced him to miss, and that he wished to be retrained to become a cashier. (ECF No. 43-3 ¶ 17.) This 2017 date appears to be a typographical error, and read in context with the rest of Plaintiff's declaration, it is clear that Plaintiff intended to offer evidence that he communicated these two items to his supervisors on March 1, 2015.

to his request represented Defendant doing less than "everything in its power to find a reasonable accommodation" relating to Plaintiff's desire to be trained as a cashier, *Lucent Techs., Inc.*, 642 F.3d at 743 (quoting *Jensen*, 102 Cal. Rptr. 2d at 68).

Second, there is evidence that could convince a reasonable jury that Defendant expended little energy in helping him lodge his request for accommodation in the appropriate manner. Testimony from a supervisor in Defendant's Modesto store, for example, suggests that Defendant's general practice in dealing with workplace accommodation requests was to take affirmative steps to assist the requesting employee in completing the required documentation. (*See* ECF No. 43-6 at 122 (containing testimony from Lagos that when an employee requests an accommodation, "then at that point we'd offer him the [reasonable accommodation request] form to fill out").) Plaintiff presents evidence, however, that no such assistance — or really any assistance at all — was offered to him in connection with his request to be retrained as a cashier. (*See* ECF No. 43-3 ¶¶ 14–15, 21.) Furthermore, there is evidence that Defendant ignored documentation from Plaintiff's physician a short while before he verbally requested to be trained to become a cashier, documentation which specifically described short-term physical restrictions which might reasonably have been accommodated by training Plaintiff to work as a cashier. (*See* ECF No. 46-2 ¶¶ 45–47; ECF No. 43-4 at 124–25, 127–28.)

A reasonable jury considering these facts would be entitled to conclude that Defendant simply did not do all it could to help Plaintiff obtain the reasonable accommodation he requested to alleviate his knee pain. *See Jensen*, 102 Cal. Rptr. 2d at 68 (holding that the critical question in a failure-to-accommodate case is "whether the informal process broke down, and, if so, which party was responsible"); *Gelfo v. Lockheed Martin Corp.*, 43 Cal. Rptr. 3d 874, 896 n.23 (Ct. App. 2006) ("Because the evidence [on the question of which party bore the blame for a breakdown in the interactive process] is conflicting and the issue of the parties' efforts and good faith is factual, the claim is properly left for the jury's consideration.").

### iii.    *Conclusion re FEHA Failure-to-Accommodate Claim*

For the foregoing reasons, Defendant is not entitled to summary judgment on Plaintiff's failure-to-accommodate claim on the basis of either of the two grounds raised in its moving

papers.

D.    Failure to Engage in the Interactive Process in Violation of FEHA

Defendant moves the Court to grant summary judgment in its favor on Plaintiff's claim for failure to engage in the interactive process. Defendant bases its motion on two alternative grounds: (i) failure to exhaust administrative remedies; and (ii) failure to establish a *prima facie* case. (ECF No. 42-1 at 22–24.)

*i.    Administrative Exhaustion*

Defendant argues that Plaintiff failed to exhaust his administrative remedies regarding his claim for failure to engage in the interactive process because he did not include in his DFEH complaint "any factual allegations regarding the cashiering accommodation Plaintiff now claims he did not receive." (ECF No. 42-1 at 21.)

The Court articulated the legal standard applicable to administrative exhaustion earlier in this Order, and for the sake of brevity, will not duplicate it here. *See supra* Part III.C.i.

Plaintiff's administrative complaint "allege[d] that [Defendant] took the following adverse actions against [Plaintiff]: Discrimination, Harassment, Retaliation[,] Denied a good faith interactive process, . . . Denied reasonable accommodation." (ECF No. 43-6 at 6.) It further alleged that Defendant and its employees took numerous actions that could reasonably be interpreted as failing to engage in an interactive process with Plaintiff regarding his request for modified duty. For instance, Plaintiff's DFEH complaint alleged that he presented Defendant's secretary with a physician's note requesting light or modified duty, and that "[n]obody at the company engaged in any communications with Plaintiff as to accommodations that are available to Plaintiff." (ECF No. 43-6 at 7.) Plaintiff's DFEH complaint further alleged that "Plaintiff was specifically told that because his injury took place outside of work, he was not to be accommodated at work and he was to perform his regular duties." (ECF No. 43-6 at 7.)

It is clear to the Court that the DFEH complaint's allegations were more than sufficient to serve as a preview that specific instances of Defendant's alleged refusal to engage in an interactive process with him were "likely to be uncovered" in the course of investigating that claim. *Okoli*, 43 Cal. Rptr. 2d at 63. The facts in Plaintiff's DFEH complaint describe a situation

in which Defendant could and should have done more to engage in communications with Plaintiff regarding the type and scope of accommodation he was requesting.  (ECF No. 43-6 at 7.) Furthermore, Plaintiff's DFEH complaint specifically stated that he believed he was "[d]enied a good faith interactive process."  (ECF No. 43-6 at 6.)  Defendant presents no authority for the proposition that a charge in a DFEH complaint only exhausts administrative requirements where it sets out all pertinent factual details supporting said charge.  (*See* ECF No. 42-1 at 20–21); *Nealy v. City of Santa Monica*, 184 Cal. Rptr. 3d 9, 24 (Ct. App. 2015) (holding that "the employee should be able to identify specific, available reasonable accommodations through the litigation process, and particularly by the time the parties have conducted discovery" (citing *Scotch*, 93 Cal. Rptr. 3d at 365)).

Here, DFEH received notice of Plaintiff's failure-to-engage-in-the-interactive-process theory under FEHA, even if it arguably did not receive notice of the particulars of this alleged failure by Defendant to interact with Plaintiff regarding his request to become a cashier.  (*See* ECF No. 43-6 at 6 (alleging that Defendant "took the following adverse actions against [Plaintiff]: Discrimination, Harassment, Retaliation[,] Denied a good faith interactive process, . . . Denied reasonable accommodation").)  But that is effectively the interpretation of the law that Defendant would have the Court adopt under these circumstances, where Plaintiff's administrative allegations clearly contemplate a claim of failure to engage in an interactive process but simply do not set out exactly what type of accommodation — retraining as a cashier — was allegedly never the subject of the required interaction between Plaintiff and Defendant. *See Couveau*, 218 F.3d at 1082 ("An FEHA complaint . . . may encompass any discrimination that is 'like or reasonably related to' the allegations made in the charge of discrimination." (citing *Okoli*, 43 Cal. Rptr. 2d at 61)).

Consequently, Defendant's motion for summary judgment on Plaintiff's theory of failure to engage in the interactive process, to the extent that motion is predicated on administrative exhaustion requirements, is without merit.

///

///

1                *ii.*      Prima Facie *Case of Failure to Engage in the Interactive Process*

Defendant argues that Plaintiff's evidence fails to establish a *prima facie* case of failure to

engage in the interactive process because there is no evidence that Plaintiff complied with

Defendant's policies to request a reasonable accommodation in the first place.  (*See* ECF No. 42-

1 at 22–23.)  According to Defendant, since Plaintiff did not follow proper procedures to request

an accommodation, there was nothing that would trigger Defendant's obligation to engage in the

interactive process.  (ECF No. 42-1 at 23 ("Indeed, WinCo could not have failed to engage in the

interactive process for requests that Plaintiff never followed up on, or that were admittedly never

submitted or applied for.").)  Plaintiff argues that an employer's obligation to engage in the

interactive process is relatively easy to activate and "does not need to follow any technical

requirements."  (ECF No. 43 at 23.)  The implication is that Defendant became obligated to

engage in the interactive process when Plaintiff submitted his request to be retrained as a cashier

in March of 2015, even though he did not submit the required paperwork to formally apply for the

position.  (ECF No. 43 at 23.)

A cause of action for failure to engage in the interactive process requires proof of at least

two elements.  "First, the employee must request an accommodation."  *Gelfo*, 43 Cal. Rptr. 3d at

890 (citing *Prilliman v. United Air Lines, Inc.* 62 Cal. Rptr. 2d 142, 152 (Ct. App. 1997)).

"Although it is the employee's burden to initiate the process, no magic words are necessary, and

the obligation arises once the employer becomes aware of the need to consider an

accommodation."  *Id.* at 896 n.23.  "Second, the parties must engage in an interactive process

regarding the requested accommodation and, if the process fails, responsibility for the failure rests

with the party who failed to participate in good faith."  *Id.* at 890 (citing *Jensen*, 102 Cal. Rptr. 2d

at 70–71).

Defendant's argument is unconvincing here for many of the same reasons the Court

articulated in denying summary judgment on Plaintiff's failure-to-accommodate claim.  The

available evidence demonstrates that Plaintiff requested general accommodation in writing in

January 22, 2015.  (ECF No. 46-2 ¶ 26; ECF No. 32 at 184.)  Defendant provides no evidence

refuting Plaintiff's contention that it received Plaintiff's Reasonable Workplace Accommodation

Request Form.  (*See* ECF No. 46-2 ¶ 27.)  Further evidence demonstrates that Plaintiff requested to be retrained to become a cashier around two months later by speaking to his supervisors.  (ECF No. 46-2 ¶ 48; ECF No. 43-3 ¶ 17.)  On these facts alone, a reasonable jury could find that Defendant became "aware of the need to consider an accommodation" for Plaintiff regardless of the documentation he subsequently submitted.  *Gelfo*, 43 Cal. Rptr. 3d at 896 n.23.  And since the Court has already found that there are genuine disputes of material fact going to the question of which party bears the blame for the breakdown in the interactive process, *see supra* Part III.C.ii, the same evidence upon which the Court based that ruling is sufficient to defeat Defendant's argument that it "satisfied all of its obligations to engage in the interactive process" (ECF No. 42-1 at 23).

       *iii.*       *Conclusion re FEHA Claim for Failure to Engage in the Interactive Process*

For the foregoing reasons, Defendant is not entitled to summary judgment on Plaintiff's claim for failure to engage in the interactive process.

      E.      Retaliation in Violation of FEHA

Defendant moves for summary judgment on Plaintiff's claim for unlawful retaliation in violation of FEHA.  (*See* ECF No. 42-1 at 24.)  Defendant's argument is based primarily on what it characterizes as the absence of a causal link between Plaintiff's termination and his taking a leave of absence.  (ECF No. 42-1 at 24 ("[T]here is no evidence that Plaintiff suffered an adverse employment action for taking a leave of absence.").)  Defendant also argues that even if a *prima facie* case of causation was established, Plaintiff has no evidence of pretext.  (ECF No. 42-1 at 24.)

Plaintiff argues that the temporal proximity between when he returned from taking protected leave on March 1, 2015, and (i) when he was disciplined for attending a physical therapy appointment the next day, and (ii) when he was terminated nine days later, is sufficient to establish a *prima facie* case of causation on his retaliation claim.  (ECF No. 43 at 25.)  And responding to Defendant's assertion that there is no evidence of pretext, Plaintiff incorporates the argument he advanced regarding the evidence of pretext in the context of his FEHA

discrimination claim.  (*See* ECF No. 42-1 at 26 (arguing that "Defendant's reasons for Plaintiff's termination are pretextual as discussed above")).)

The analysis courts employ in FEHA-prohibited retaliation cases is substantially similar to the analysis they employ in FEHA-prohibited discrimination cases.  "To establish a prima facie case of retaliation under the FEHA, a plaintiff must show '(1) he or she engaged in a "protected activity," (2) the employer subjected the employee to an adverse employment action, and (3) a causal link existed between the protected activity and the employer's action.'"  *Scotch*, 93 Cal. Rptr. 3d at 366 (quoting *Yanowitz v. L'Oreal USA, Inc.*, 116 P.3d 1123, 1130 (Cal. 2005)). "Once an employee establishes a prima facie case, the employer is required to offer a legitimate, nonretaliatory reason for the adverse employment action."  *Yanowitz*, 116 P.3d at 1130 (citing *Morgan*, 105 Cal. Rptr. 2d at 665).  "If the employer produces a legitimate reason for the adverse employment action, the presumption of retaliation 'drops out of the picture,' and the burden shifts back to the employee to prove intentional retaliation."  *Id.*  And as with discrimination prohibited by FEHA, "[t]emporal proximity does not alone satisfy this burden" once it shifts back to the plaintiff in a FEHA retaliation case.  *Nadaf-Rahrov v. Neiman Marcus Grp., Inc.*, 83 Cal. Rptr. 3d 190, 223 (Ct. App. 2008) (citing *Loggins v. Kaiser Permanente Int'l*, 60 Cal. Rptr. 3d 45, 54 (Ct. App. 2007)).

The Court's analysis of Plaintiff's evidentiary showing on the causation element of his retaliation claim mirrors its analysis of the same element of his discrimination claim, so the Court will only briefly restate it here.

### i. Temporal Proximity

"[E]vidence of temporal proximity is sufficient to demonstrate a prima facie case of retaliation."  *Hooker v. Parker Hannifin Corp.*, 548 F. App'x 368, 370 (9th Cir. 2013).

Here, Plaintiff presents evidence that he was terminated a mere nine days after returning from medical leave.  (ECF No. 46-1 ¶¶ 70, 73, 83; ECF No. 43-4 at 107.)  Indeed, the available evidence indicates that Plaintiff suffered an adverse employment action the very day after he returned from medical leave, when he was assessed two attendance-related points even though he claims he was given permission by his supervisor to leave work to attend a physical therapy

appointment.  (ECF No. 46-1 ¶¶ 70, 73; ECF No. 46-2 ¶¶ 48, 52; ECF No. 32 at 39, 42.)  Given the close temporal proximity between the protected activity (in this case, Plaintiff's decision to take medical leave to allow his knee to heal) and adverse employment actions that occurred a mere matter of days later, the Court finds that Plaintiff's evidence is sufficient to meet his burden of demonstrating a *prima facie* case of retaliatory causation.  *See Scotch*, 93 Cal. Rptr. 3d at 366 (holding that evidence showing an employee suffered an adverse employment action weeks after engaging in protected activity was sufficient to make a *prima facie* showing of causation).

*ii.*　　*Legitimate Business Reason for Termination*

That being said, Plaintiff skips a step in the analysis by concluding that this "short period of time between the protected activity and the adverse employment action in this case raises an inference of causation sufficient to survive summary judgment," because Defendant presents evidence that it had a legitimate, nonretaliatory reason for terminating Plaintiff's employment. (ECF No. 43 at 25); *see also Scotch*, 93 Cal. Rptr. 3d at 366 ("By establishing a prima facie case of retaliation, [the plaintiff] shifted the burden to [the defendant] of showing a legitimate, nonretaliatory reason for the adverse employment action.").  For the same reasons the Court articulated earlier in this Order relating to Plaintiff's FEHA discrimination claim, *see supra* Part III.B.iv, and based on the same evidentiary showing (*see, e.g.*, ECF No. 46-1 ¶¶ 10–13 (setting forth attendance-related points assessed to Plaintiff in 2014 for reasons unrelated to his 2015 knee injury); ECF No. 32-1 at 14–18), the Court finds that Defendant has carried its burden of producing evidence suggesting that its decision to terminate Plaintiff was motivated by legitimate, nonretaliatory reasons.

Consequently, Plaintiff must now meet its burden to produce evidence establishing that Defendant's reasons were pretextual.  *See Scotch*, 93 Cal. Rptr. 3d at 366–67.

*iii.*　　*Pretext*

Plaintiff's burden of producing evidence suggestive of retaliatory pretext is similar, if not identical, to his burden to demonstrate discriminatory pretext.  *See Hooker*, 548 F. App'x at 370 ("To establish pretext, [the plaintiff] 'must demonstrate such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons . .

. . .'" (quoting *Hersant v. Dep't of Soc. Servs.*, 67 Cal. Rptr. 2d 483, 488 (Ct. App. 1997))).

Defendant asserts that "Plaintiff does not have any evidence of pretext" in the context of his FEHA retaliation claim. (ECF No. 42-1 at 24.) But the circumstantial evidence the Court analyzed and found sufficient to raise a triable issue as to pretext for purposes of Plaintiff's discrimination claim serves the same function in the retaliation context. *See Yanowitz*, 116 P.3d at 1144 (applying the same burden-shifting analysis from FEHA discrimination claims in the context of a summary judgment motion attacking a claim of retaliation). This is because nearly all the evidence the Court found to be suggestive of pretext in the discrimination context related to Defendant's behavior after Plaintiff returned from his medical leave, and so is also highly relevant to Plaintiff's claim that he was retaliated against when he returned to work in March of 2015 after engaging in the protected activity of taking medical leave. This evidence includes, *inter alia*, the short temporal proximity between Plaintiff's protected activity and adverse employment action (*see* ECF No. 46-1 ¶¶ 70, 73, 83; ECF No. 46-2 ¶¶ 48, 52; ECF No. 43-4 at 107); the discipline he was subjected to for leaving his shift early on March 2, 2015, despite the evidence that his supervisor permitted him to leave that day (*see* ECF No. 46-2 ¶ 52; ECF No. 43-6 at 61, 77–78), and compared with the leniency he had been shown by his employer for doing the same thing prior to taking medical leave (*see* ECF No. 43-3 ¶ 20); and the manner in which his fifth-hour rule violation occurred and was handled by his supervisor on March 10, 2015 (*see* ECF No. 43-6 at 65–66, 83, 95, 102–03). Taken together, this circumstantial evidence that Defendant created a pretextual reason to terminate Plaintiff for his attendance-related transgressions in March of 2015 is substantial enough that it merits examination by a factfinder at a trial, one that has the benefit of making determinations regarding evidentiary weight and witness credibility. *See Anderson*, 477 U.S. at 255 ("Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge . . . .").

For the foregoing reasons, Defendant is not entitled to summary judgment on Plaintiff's FEHA retaliation claim.

///

55

1    F.    Intentional Infliction of Emotional Distress

2        Defendant moves for summary judgment in its favor on Plaintiff's cause of action for

3    intentional infliction of emotional distress.  (ECF No. 42-1 at 25–27.)  Defendant argues that such

4    claims brought for employment-related violations are barred by the doctrine of workers'

5    compensation exclusivity.  (ECF No. 42-1 at 25.)  Defendant also argues that Plaintiff cannot

6    establish a *prima facie* case of intentional infliction of emotional distress because the emotional

7    distress he allegedly suffered was not, as a matter of law, severe.  (ECF No. 42-1 at 27.)

8        Plaintiff disputes the applicability of the workers' compensation exclusivity bar to cases

9    involving alleged violations of statutes such as FEHA.  (ECF No. 43 at 27.)  Plaintiff also asserts

10   that his evidence that he suffered from "sleepless nights, headaches, and general fear of not being

11   able to provide for his family" is sufficient to withstand summary judgment on his claim for

12   intentional infliction of emotional distress.  (ECF No. 43 at 27; *see* ECF No. 43-3 ¶ 24.)

13       The elements of a cause of action for intentional infliction of emotional distress are "(1)

14   extreme and outrageous conduct by the defendant with the intention of causing, or reckless

15   disregard of the probability of causing, emotional distress; (2) the plaintiff's suffering severe or

16   extreme emotional distress; and (3) actual and proximate causation of the emotional distress by

17   the defendant's outrageous conduct."  *Hughes v. Pair*, 209 P.3d 963, 976 (Cal. 2009) (quoting

18   *Potter v. Firestone Tire & Rubber Co.*, 863 P.2d 795, 819 (Cal. 1993)) (citing *Christensen v.

19   Superior Court*, 820 P.2d 181, 202 (Cal. 1991)).  "Severe emotional distress means 'emotional

20   distress of such substantial quality or enduring quality that no reasonable [person] in civilized

21   society should be expected to endure it.'"  *Id.* (alteration in original) (quoting *Potter*, 863 P.2d at

22   821).

23       Defendant is entitled to summary judgment on Plaintiff's claim for intentional infliction of

24   emotional distress because no reasonable jury could conclude that "sleepless nights, headaches,

25   and a general fear of not being able to provide for [his] family" constitute severe emotional

26   distress.  (ECF No. 43-3 ¶ 24.)  Sleepless nights and headaches are endured by millions of people

27   in this country every day.  And it is an unfortunate truth in the modern age that millions of people

28   still fear for their ability to provide for their families.  Plaintiff's symptoms simply do not rise to a

level of severity that a reasonable jury would conclude is "of such substantial quality or enduring quality that no reasonable [person] in civilized society should be expected to endure it." *Hughes*, 209 P.3d at 976 (alteration in original) (quoting *Potter*, 863 P.2d at 821). Plaintiff's argument to the contrary is based on decades-old authority that is patently insufficient to overcome the California Supreme Court's 2009 articulation of the law of intentional infliction of emotional distress set forth in *Hughes*. (*See* ECF No. 43 at 27 (citing cases from 1952 and 1978).)

Accordingly, Defendant's motion for summary judgment on Plaintiff's claim for intentional infliction of emotional distress is GRANTED.

### G. Failure to Prevent Discrimination

Defendant moves for summary judgment on Plaintiff's claim for failing to prevent discrimination in violation of FEHA. (ECF No. 42-1 at 27–28.) Defendant argues that since Plaintiff's FEHA discrimination claim fails, so must his claim that Defendant failed to prevent discrimination. (ECF No. 42-1 at 28.) The Court notes with some measure of frustration that Plaintiff makes no effort to directly address Defendant's argument in this regard. Nonetheless, a district court generally should not grant summary judgment solely on the basis that an argument is unopposed, unless the moving party affirmatively demonstrates its entitlement to summary judgment. *See Martinez v. Stanford*, 323 F.3d 1178, 1183 (9th Cir. 2003).

FEHA makes it an unlawful employment practice for "an employer . . . to fail to take all reasonable steps necessary to prevent discrimination and harassment from occurring." Cal. Gov't Code § 12940(k).[5] An employer sued for failing to prevent discrimination may pursue a number of avenues to demonstrate its entitlement to summary judgment. "One such reasonable step, and one that is required in order to ensure a discrimination-free work environment, is a prompt investigation of [a] discrimination claim." *Cal. Fair Emp't & Hous. Comm'n v. Gemini Aluminum Corp.*, 18 Cal. Rptr. 3d 906, 920 (Ct. App. 2004) (citing *Northrop Grumman Corp. v. Workers' Comp. Appeals Bd.*, 127 Cal. Rptr. 2d 285, 296 (Ct. App. 2002)). "Other reasonable

---

[5] The Court notes that the Complaint appears to cite to a section of the California Government Code that targets aiding and abetting an unlawful workplace practice, not to the section of the Government Code that targets failure to prevent discrimination. (*See* ECF No. 5-1 at 12 ("Defendants' conduct as described constitutes a violation of California Government code Section 12940(i).").) The Court views this as another typographical, not substantive, oversight on Plaintiff's part.

steps an employer might take include the establishment and promulgation of antidiscrimination policies and the implementation of effective procedures to handle complaints and grievances regarding discrimination." *Id.* (citing *State Dep't of Health Servs. v. Superior Court*, 79 P.3d 556, 565–66 (Cal. 2003)). But where an employer relies on its antidiscrimination policies for summary judgment, the "employer's claim that its procedures are effective in addressing discrimination is negated by proof of retaliation." *Id.*

Here, Defendant's claim to summary judgment on Plaintiff's failure-to-prevent-discrimination claim is entirely derivative of its argument urging summary judgment on Plaintiff's discrimination claim. (*See* ECF No. 42-1 at 28 ("As shown throughout this brief, Plaintiff was terminated for a legitimate, non-discriminatory reason, dooming Plaintiff's claim for failure to prevent discrimination.")); *Trujillo v. N. Cty. Transit Dist.*, 73 Cal. Rptr. 2d 596, 602 (Ct. App. 1998) ("Employers should not be held liable to employees for failure to take necessary steps to prevent [discrimination], except where the actions took place and were not prevented."). The Court already determined that Defendant's arguments are unavailing in the context of Plaintiff's discrimination claim, meaning that these same arguments do not suffice to merit summary judgment in the context of Plaintiff's claim for failure to prevent discrimination. *See Washington v. Cal. City Corr. Ctr.*, 871 F. Supp. 2d 1010, 1027 (E.D. Cal. 2012) ("Because Plaintiff has met her burden to show genuine issues of material fact as to actionable discrimination, Defendant may be held liable for failing to prevent discrimination."). Furthermore, since Defendant does not proffer any evidence that it engaged in "a prompt investigation of [Plaintiff's] discrimination claim" after he was terminated, it cannot rely on that potential basis for summary judgment. *Gemini Aluminum Corp.*, 18 Cal. Rptr. 3d at 920 (citing *Northrop Grumman Corp.*, 127 Cal. Rptr. 2d at 296). And finally, as the Court has explained previously, a triable issue exists regarding Plaintiff's FEHA retaliation claim. *See supra* Part III.E. This precludes the entry of summary judgment on the basis that Defendant's "procedures are effective in addressing discrimination" because such an argument "is negated by proof of retaliation." *Gemini Aluminum Corp.*, 18 Cal. Rptr. 3d at 920.

Accordingly, even though Plaintiff failed to respond to Defendant's request for summary

judgment on the claim of failure to prevent discrimination, it is simultaneously true that

Defendant has not affirmatively demonstrated its entitlement to summary judgment. *See*

*Martinez*, 323 F.3d at 1183.

H.      Wrongful Termination in Violation of Public Policy

Defendant moves for summary judgment on Plaintiff's claim that he was wrongfully

terminated in violation of public policy. (*See* ECF No. 42-1 at 28.) Defendant's primary

argument is that Plaintiff presents no evidence establishing a nexus between any protected

activity and his termination. (ECF No. 42-1 at 28.) Plaintiff argues that because he "has stated

sufficient evidence of a FEHA violation to survive summary judgment, summary adjudication of

Plaintiff's claim for wrongful termination is similarly improper at this time." (ECF No. 43 at 26.)

"The elements for this tort [of wrongful termination in violation of public policy] are (1)

the existence of a public policy and (2) a nexus between the public policy and an employee's

termination." *Lucent Techs., Inc.*, 642 F.3d at 749 (citing *Turner v. Anheuser-Busch, Inc.*, 876

P.2d 1022, 1034 (Cal. 1994)). The law in California has long been established that "disability

discrimination can form the basis of a common law wrongful discharge claim." *City of Moorpark

v. Superior Court*, 959 P.2d 752, 764 (Cal. 1998). Furthermore, where a plaintiff's claim of

unlawful treatment under FEHA survives summary judgment, so too does the plaintiff's related

claim of wrongful termination in violation of public policy. *Earl*, 658 F.3d at 1118 (citing

*Stevenson v. Superior Court*, 941 P.2d 1157, 1166–67 (Cal. 1997)); *see also Soria*, 210 Cal. Rptr.

3d at 88 (holding that where employee "has established triable issues of fact as to whether

[employer]'s stated reason for terminating her was pretext for unlawful discrimination . . . ,

summary adjudication on the wrongful termination cause of action should have been denied").

The Court has already determined that Defendant is not entitled to summary judgment on

Plaintiff's claim of disability discrimination in violation of FEHA. *See supra* Part III.B.

Consequently, Defendant is also not entitled to summary judgment on Plaintiff's claim that he

was terminated in violation of public policy. *See Lucent Techs., Inc.*, 642 F.3d at 742 n.13

(characterizing wrongful termination claim as "entirely reliant on a finding of discrimination

under the FEHA"); *Arteaga*, 77 Cal. Rptr. 3d at 677 ("The wrongful termination claim is, after

all, based on the FEHA's prohibition of physical disability discrimination.").

## I.     Interference with FMLA Leave

Defendant moves for summary judgment on Plaintiff's claim for interference with his rights as protected by the FMLA.  (ECF No. 42-1 at 29.)  Defendant argues that Plaintiff has no evidence that his FMLA rights were ever wrongfully denied, because Defendant fully accommodated the FMLA leave requests Plaintiff submitted in January and February of 2015, and because Plaintiff never actually requested any additional FMLA leave in March of 2015.  (ECF No. 42-1 at 29.)  Defendant also asserts that because it had a legitimate, non-discriminatory reason to terminate Plaintiff's employment, "Plaintiff cannot establish any causal connection between his FMLA leave and subsequent termination."  (ECF No. 42-1 at 29.)

As pleaded in his Complaint, Plaintiff's FMLA interference claim is two-pronged.  It alleges that Plaintiff was terminated (i) in retaliation for having taken leave protected by the FMLA in order to rest his injured knee, presumably in January and February of 2015, and (ii) for expressing his intent to take additional FMLA leave for his knee in the future, leave which he could not take because he was terminated.  (*See* ECF No. 5-1 at 14 ("Defendant violated the FMLA by terminating Plaintiff's employment because he had taken FMLA leave and he had requested additional FMLA leave.").)  The Ninth Circuit distinguishes between FMLA retaliation claims, which are subject to the same burden-shifting analysis as garden-variety FEHA retaliation claims and which are authorized by 29 U.S.C. § 2615(a)(2), and FMLA interference claims, which are not subject to a burden-shifting analysis and are authorized by a separate statutory provision contained at 29 U.S.C. § 2615(a)(1).  *See Sanders v. City of Newport*, 657 F.3d 772, 777–78 (9th Cir. 2011) (explaining the doctrinal differences between FMLA retaliation claims and FMLA interference claims).  Read in this context, Plaintiff's brief in opposition to summary judgment makes it clear that he has effectively abandoned any claim for FMLA retaliation, and instead wishes to proceed only on his claim for FMLA interference based on the fact that his termination made it impossible for him to take the FMLA leave to which he would have been entitled had he remained employed.  (*See* ECF No. 43 at 27–28 (citing to 29 U.S.C. § 2615(a)(1) only, and arguing that the burden-shifting analysis is not applicable to Plaintiff's FMLA

interference claims).)

Because FMLA interference claims are not subject to any burden-shifting analysis, an employee on summary judgment must only establish that "(1) he was eligible for the FMLA's protections, (2) his employer was covered by the FMLA, (3) he was entitled to leave under the FMLA, (4) he provided sufficient notice of his intent to take leave, and (5) his employer denied him FMLA benefits to which he was entitled." *Escriba v. Foster Poultry Farms, Inc.*, 743 F.3d 1236, 1243 (9th Cir. 2014) (quoting *Sanders*, 657 F.3d at 778). An employee's responsibility to provide notice to an employer regarding intended FMLA leave is minimal because "[e]mployees need only notify their employers that they will be absent under circumstances which indicate that the FMLA might apply." *Bachelder v. Am. W. Airlines, Inc.*, 259 F.3d 1112, 1130 (9th Cir. 2001) (quoting 29 C.F.R. § 825.302(c)). Indeed, an "employee need not expressly assert rights under the FMLA or even mention the FMLA, but may only state that leave is needed." *Id.* (quoting 29 C.F.R. § 825.302(c)). And finally, evidence of employer intent to deny FMLA rights to an employee is not necessary for the employee to defeat summary judgment. *See id.* ("An employer who acts in good faith and without knowledge that its conduct violated the Act . . . is still liable for actual damages regardless of its intent.").

Defendant's summary judgment papers attack only the last two elements of Plaintiff's *prima facie* case of FMLA interference. (*See* ECF No. 46 at 10 (arguing that summary judgment on Plaintiff's FMLA interference claim is warranted because Plaintiff failed to "show that he provided sufficient notice of his intent to take FMLA leave and WinCo's subsequent denial of FMLA benefits").) But Defendant's argument that "Plaintiff provides no factual evidence that he ever requested additional leave" misses the point, because the instant question is whether there is a triable issue regarding whether Plaintiff's FMLA rights were infringed upon after he expressed his intention to take FMLA leave in the future. (ECF No. 46 at 10.) The Court finds that there is such a triable issue. First, there is direct evidence in the record that Plaintiff did inform his supervisors of his intention to take FMLA leave when needed to accommodate his knee injury. (ECF No. 43-3 ¶ 17.) This evidence is sufficient to carry Plaintiff's summary judgment burden to show that Defendant was on notice that Plaintiff would require FMLA leave in the future,

because an "employee need not expressly assert rights under the FMLA or even mention the FMLA, but may only state that leave is needed." *Bachelder*, 259 F.3d at 1130 (quoting 29 C.F.R. § 825.302(c)). Just because Plaintiff's evidence that he expressed an intention to take FMLA leave is contained in a self-serving declaration does not mean the Court can or should disregard it. *See Nigro*, 784 F.3d at 497 (holding that a self-serving declaration is not inadmissible solely because it is self-serving, and that a district court should not disregard the evidence from a self-serving declaration unless it "states only conclusions and not facts that would be admissible evidence"). Furthermore, just because Plaintiff did not actually submit a request for knee-related FMLA leave before he was terminated on March 10, 2015, does not necessarily mean that he also did not inform his supervisors nine days prior that he intended to use FMLA leave at some point in the future. (*See* ECF No. 46-2 ¶ 14; ECF No. 43-3 ¶ 17.)

Second, there is circumstantial evidence connecting Plaintiff's negative treatment by Defendant — including his termination — in March of 2015 with his announcement to his superiors that he would need FMLA leave in the future to address his knee injury. There is, for instance, the temporal proximity between the day Plaintiff told his supervisors that he would need FMLA leave in the future (*see* ECF No. 43-3 ¶ 17), and the very next day when he was disciplined for leaving his shift early (*see* ECF No. 46-2 ¶ 52). Regarding this March 2, 2015, shift, there is also the evidence the Court has previously analyzed that Plaintiff's behavior was treated differently after March 1, 2015, when he announced his need for FMLA leave, as compared to previous shifts when he had departed early prior to announcing that he intended to take such leave. *See supra* Part III.C.v.b. And there is, of course, the mere nine days between when Plaintiff announced his intention to take FMLA leave (*see* ECF No. 43-3 ¶ 17), and the day he was terminated (*see* ECF No. 46-1 ¶ 38). Taken together as a whole and construing the facts in the manner most favorably to Plaintiff, this evidence is sufficient for a reasonable factfinder to conclude that one of the reasons Defendant began treating Plaintiff differently after March 1, 2015, was because he told his supervisors on that day that he would need additional FMLA leave in the future. *See, e.g.*, *Schultz v. Wells Fargo Bank, Nat'l Ass'n*, 970 F. Supp. 2d 1039, 1055 (D. Or. 2013) (finding that temporal proximity measured in days between FMLA-protected action

1  and adverse employment action was "sufficient to allow a factfinder to infer the requisite

2  causation"); *Sutton v. Derosia*, No. 1:11-cv-01426-LJO, 2012 WL 4863788, at *13 (E.D. Cal.

3  Oct. 12, 2012) (denying employer's motion for summary judgment on FMLA interference claim

4  where employee was terminated two weeks after returning from FMLA-protected leave).

5      Since there is no burden-shifting analysis to undertake for purposes of Plaintiff's FMLA

6  interference claim, Defendant's motion for summary judgment on Plaintiff's FMLA interference

7  claim must be denied. *See Sanders*, 657 F.3d at 777–78.

8          J.      Punitive Damages

9      Defendant moves for summary adjudication on the issue of whether Plaintiff's claims

10  would, if proven, entitle him to punitive damages. Defendant argues that there is no evidence it

11  acted maliciously, oppressively, or fraudulently, as it must have done in order to expose itself to

12  punitive damages. (ECF No. 42-1 at 30.) Defendant also argues that punitive damages are not

13  available to Plaintiff because all of Defendant's allegedly unlawful actions were performed by

14  non-managing agents. (ECF No. 42-1 at 30.) Specifically, Defendant asserts that Lagos was

15  merely an Assistant Store Manager at the time he made the decision to terminate Plaintiff's

16  employment, and therefore "had no authority to set, create or alter company policy" as would be

17  required to expose Defendant to punitive damages. (ECF No. 46 at 11.) Plaintiff argues that

18  punitive damages are permissible for FEHA claims and are warranted here because Lagos had the

19  authority to hire and fire and enforce company policy, and because Defendant "acted contrary to

20  the FEHA laws and terminated Plaintiff as a result of his disability." (ECF No. 43 at 29.)

21      The law is clear that for punitive damages to be assessed against a corporate defendant for

22  an act done by the corporation's employee, said act "must be on the part of an officer, director, or

23  managing agent of the corporation." Cal. Civ. Code § 3294(b). To qualify as a managing agent

24  under this statute, a person must do more than supervise the terminated employee and have the

25  authority to effectuate that employee's firing. *White v. Ultramar, Inc.*, 981 P.2d 944, 954 (Cal.

26  1999) (holding that a supervisor's "supervision of plaintiff and her ability to fire him alone were

27  insufficient to make her a managing agent"). Instead, "[t]he managing agent must be someone

28  who exercises substantial discretionary authority over decisions that ultimately determine

1    corporate policy." *Id.* at 951.

2         Plaintiff does not appear to contend that Lagos was an officer or director of Defendant.

3    (*See* ECF No. 42 at 28.)  Indeed, Plaintiff's only contention that he would be entitled to punitive

4    damages is that Lagos qualified as a managing agent because he "ha[d] the authority to hire, fire

5    and enforce company policy." (ECF No. 43 at 28.)  This is insufficient to create a genuine

6    dispute of material fact about whether Lagos was a managing agent of Defendant.  First, in *White*,

7    the California Supreme Court made it clear that a corporate employee is not a managing agent

8    simply because that employee supervises other workers and has the authority to terminate them.

9    981 P.2d at 954.  But the main piece of evidence Plaintiff presents regarding Lagos's authority is

10   that he had authority to do only that.  (*See* ECF No. 43-6 at 109 (containing testimony from Lagos

11   that he was in charge of hiring and firing).)

12        Second, Plaintiff presents evidence only that Lagos could enforce company policy.  (*See*

13   ECF No. 43-6 at 115 (containing testimony from Lagos that he enforced Defendant's leave

14   policies).)  The implication is that Lagos's authority to enforce company policy is sufficient for

15   the Court to send to a jury the question of whether Lagos was acting as a managing agent when he

16   terminated Plaintiff.  (*See* ECF No. 43 at 28; ECF No. 46-1 ¶ 312 (arguing that "Mr. Lagos is a

17   managing agent of Defendant").)  But as the California Supreme Court made clear in *White*, there

18   is a crucial difference between *enforcing* and *determining* corporate policy under section 3294(b)

19   of California's Civil Code.  In that case, a store manager who terminated the plaintiff's

20   employment managed no less than eight stores and, crucially, made "significant decisions

21   affecting both store and company policy."  *White*, 981 P.2d at 954.  The store manager exercised

22   "substantial discretionary authority over decisions that ultimately determined corporate policy in

23   a most crucial aspect of" the defendant employer's business, such that the manager's actions

24   exposed her corporate employer to punitive damages.  *Id.*  There is no indication in the record

25   before the Court in this case, however, that Lagos made decisions that "ultimately determined

26   corporate policy" for Defendant.  *Id.*  Rather, the most that can be said about Lagos is that he

27   "enforce[d] company policy" that was determined by those higher above him in the corporate

28   hierarchy.  (ECF No. 43 at 28.)

Nothing in the cases cited by Plaintiff in support of his claim for punitive damages convinces the Court otherwise.  In *Brandon v. Rite Aid Corp.*, the defendant employer did not raise the issue of whether its employees who terminated the plaintiff qualified as officers, directors, or managing agents.  408 F. Supp. 2d 964, 982 n.10 (E.D. Cal. 2006).  Here, of course, the authority of Defendant's employee who terminated Plaintiff is Defendant's main argument in support of summary adjudication of Plaintiff's claim for punitive damages.  (*See* ECF No. 46 at 11.)  And in *Roberts v. Ford Aerospace & Commc'ns Corp.*, punitive damages were upheld against a corporate defendant where the defendant's manager who terminated the plaintiff testified that no single supervisor had authority to fire another employee, and that all termination decisions required approval of the corporation's Industrial Relations department.  274 Cal. Rptr. 139, 144 (Ct. App. 1990).  Here, Plaintiff makes no showing that his termination decision required approval of a corporate department, resting his argument and his evidentiary showing entirely on Lagos's personal authority.  (*See* ECF No. 43 at 28–29; ECF No. 46-2 ¶¶ 76–77.)[6]

Consequently, Plaintiff fails to produce evidence that a reasonable factfinder might rely upon to decide that he was terminated by an officer, director, or managing agent of Defendant.  Since such a showing is mandatory in order to recover punitive damages in California, Defendant's motion for summary adjudication is GRANTED as to Plaintiff's claim for punitive damages.  *See* Cal. Civ. Code § 3294(b).

## IV.  CONCLUSION

In summary, the Court GRANTS Defendant's motion for summary judgment as to Plaintiff's cause of action for intentional infliction of emotional distress and as to Plaintiff's claim that he is entitled to punitive damages.  In all other respects, Defendant's motion for summary judgment is DENIED.  The parties shall file a Notice of Trial Readiness within thirty days.

---

[6]    The Court notes that there is at least one indication in the record that the decision to terminate Plaintiff's employment may have been submitted to, or ratified by, Defendant's corporate office.  (*See* ECF No. 43-6 at 140 (containing incomplete testimony to the effect that Lagos may have spoken to Defendant's corporate office prior to terminating Plaintiff).)  However, Plaintiff does not refer or cite to this evidence anywhere in his papers or in his separate statements of fact submitted in support of those papers, so the Court finds it insufficient to create a triable issue of fact.  *See Carmen v. S.F. Unified Sch. Dist.*, 237 F.3d 1026, 1031 (9th Cir. 2001) ("The district court need not examine the entire file for evidence establishing a genuine issue of fact, where the evidence is not set forth in the opposing papers with adequate references so that it could conveniently be found.").

1    IT IS SO ORDERED.

2    Dated: October 24, 2019

                                    Troy L. Nunley
                                    United States District Judge